INGLEWOOD PARK CEMETERY ASSOCIATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 3249.   Promulgated March 2, 1927.

1. By formal corporate action petitioner set apart 25 per cent of receipts from the sale of cemetery lots as a fund for the perpetual care of burial lots. *Held*, that the fund so set apart is not income and should not be included in invested capital.

2. Value of unimproved cemetery lots owned by the petitioner at March 1, 1913, determined.

*Ralph W. Smith, Esq.*, for the petitioner.
*D. D. Shepard, Esq.*, for the respondent.

The respondent has asserted a deficiency in income and profits taxes for the year 1920 in the amount of $6,036.64. Four issues are involved: (1) Whether that part of the amount received from the

sale of burial lots during the taxable year, and set apart as a fund for the perpetual care of such lots, should be included in the petitioner's gross income; (2) whether interest from investments of the perpetual care fund was income to the petitioner; (3) whether the fund set apart for perpetual care of burial lots shall be included in the computation of the petitioner's statutory invested capital; and (4) the fair market value at March 1, 1913, of burial lots sold during 1920.

### FINDINGS OF FACT.

Petitioner is a corporation organized in 1905, under the laws of the State of California, for the establishment and conduct of a cemetery in Los Angeles County. It purchased the land for the purposes of its organization in 1906, and immediately set about making the necessary surveys, building roads, sinking wells, and erecting buildings for the conduct of a cemetery.

The minutes of the board of directors of the association, dated August 8, 1911, contain the following:

> On motion of C. B. Hopper, seconded by G. H. Latteau, and unanimously carried, it was resolved that beginning with the month of August, 1911, the amount set aside and invested on account of perpetual care fund be increased from 15 per cent to 25 per cent on the gross monthly sales.

Salesmen employed by the petitioner were instructed to assure the purchasers of burial lots that 25 per cent of the purchase price would go into a fund for the perpetual care of the lots. Each deed executed to convey title to purchasers of lots contains the following:

> Said lot is granted with right to the grantee for perpetual care thereof by and at the expense of said Cemetery Association.

All receipts from sales of burial lots were accounted for in a lot account, and at the end of each month 25 per cent of such receipts was transferred and charged by appropriate journal and ledger entries to an account designated as "Perpetual Care," and the amounts so charged, were also deposited in a special bank account designated as "Trust Account for Perpetual Care." From time to time, the principal amount of the fund for perpetual care of graves was invested in Liberty bonds, municipal bonds, real estate mortgages, and other interest-bearing securities. No part of the funds so segregated and invested was ever used for any of the operating expenses of the petitioner or the payment of dividends. The income from the invested perpetual care fund for the year 1920 was commingled with the other income of the petitioner and was used for general corporate purposes, including the perpetual care of burial lots. Prior to 1920, the amounts expended for perpetual care were somewhat in excess of the income from the invested perpetual care fund.

At December 31, 1919, the fund set apart by the petitioner for perpetual care of burial lots was $172,257.31. During the year 1920, the receipts from burial lots amounted to $272,937.50, and approximately 25 per cent of such receipts, in the amount of $67,297, was transferred to the perpetual care fund. In its income and profits-tax return for 1920, the petitioner included the amount of $67,297 in its gross income, and paid the tax thereon, and included the amount of $172,257.31—its perpetual care fund at the beginning of the year—in the computation of its statutory invested capital for such year.

The value of the improved cemetery-lot land owned by this petitioner at March 1, 1913, was 41.65 cents per square foot, of the partially improved land 36.65 cents per square foot, and of the unimproved land 15 cents per square foot. The cost of converting unimproved into improved lands was 10 cents per square foot. During the year 1920 the petitioner sold 15,566 square feet of land that was unimproved at March 1, 1913.

In its income and profits-tax return for 1920 the petitioner reported that its unimproved land had a value of $1,500 per acre, or 3.44 cents per square foot. This valuation was accepted by the respondent. Subsequently, the petitioner filed an amended return for the year in question, and thereon reported that its unimproved lands had a value of 31.65 cents per square foot. This valuation was not accepted by the respondent.

### OPINION.

LANSDON: The four issues involved in this proceeding will be discussed and decided in the order in which they are set forth in our preliminary statement, *supra*. The evidence discloses that the petitioner set apart 25 per cent of the total monthly receipts from the sale of burial lots as a fund for the perpetual care of such lots; that salesmen employed by the petitioner were instructed to call the attention of all purchasers of lots to the provision for perpetual care; that each deed conveying title to burial lots sold by the petitioner contained a perpetual care guaranty; that 25 per cent of all receipts from the sale of burial lots was transferred to the perpetual care fund at the end of each month; that the perpetual care fund was deposited in a special bank account designated as " Trust Fund for Perpetual Care "; that the principal amount of such fund was invested in income-producing securities and was maintained inviolate for the purpose for which it was set apart.

The Board has decided the following cases involving similar questions—*Los Angeles Cemetery Association*, 2 B. T. A. 495;

*Greenwood Cemetery Association*, 2 B. T. A. 910; *Springdale Cemetery Association*, 3 B. T. A. 223; and *Metairie Cemetery Association*, 4 B. T. A. 903—all, except that of the Springdale Association, in favor of the petitioners.

The *Springdale Cemetery Association* case was decided in favor of the respondent. It differed from the instant case in the following particulars. The Springdale " corporation's by-laws contained no provisions for appropriating any part of the receipts from the sale of lots as such perpetual care fund, and no resolution to that effect was passed by the directors." In the instant case such a resolution was duly passed by the directors. The Springdale Cemetery certificates of purchase covering each lot sold contained the following:

The Association will clean and keep in proper order, the surface of, and the walks belonging to, the above lot, without further charge, during the existence of said Cemetery.

This was hardly equivalent to an agreement for perpetual care. Such agreements usually extend also to the care of shrubbery and trees, the stones which mark the graves, and such markings as may be used to indicate the boundaries of the lots. Each of the Inglewood Cemetery deeds of conveyance of lots contains the following:

Said lot is granted with right to the grantee to perpetual care thereof by and at the expense of said Cemetery Association.

But if possible, a clearer and more pronounced difference lies in the fact that the officials and other salesmen of the Inglewood Association were instructed by those in charge to assure all purchasers and prospective purchasers of lots that 25 per cent of the purchase price would go into a fund for the perpetual care of the lots, and such assurance was given. We are of the opinion that this promise did not vary the terms of the written contract between the owners of the cemetery and the purchasers of its burial lots, but made the assurance as to its meaning doubly sure to both. It was in the nature of a perpetual reminder of the meaning of the contract. However, admitting for the sake of a more complete examination of the facts, and only for that purpose, that the writings did not constitute a contract for the creation of a perpetual care fund of 25 per cent of the monies received for burial lots, then, and in such case, the parol agreement, not being in contravention of the writings, would itself become an enforceable agreement. In our opinion in the case of *Metairie Cemetery Association, supra*, at pages 909 and 910, we said:

The great weight of authority is to the effect that the statute of frauds does not extend to trusts of personal property and that such trusts may be created and proved by parole. *Chew* v. *Brumagen*, 13 Wall. 497; *Allen* v. *Withrow*, 110 U. S. 119; *Trubey* v. *Pease*, 240 Ill. 513; 88 N. E. 1005; *Coyne* v. *Supreme*

*Conclave,* 106 Md. 54; 66 Atl. 704; *Bork* v. *Martin,* 132 N. Y. 280; 30 N. E. 584; *Pittman* v. *Pittman,* 107 N. C. 159; 12 S. E. 61.

There is no conflict in the evidence here with respect to the contracts. The evidence is that at the time the contracts were entered into it was agreed that the money would be held in trust for the specific purposes of the contract. This being true, we are of the opinion that a valid trust was created by parole in those contracts where there was no specific provision to that effect. The only reason that certain of the contracts contained that express provision was the fact that those lot owners insisted upon the agreement being included in writing in the contract. The same agreement, however, was actually made with all of the lot owners verbally.

The funds received by the taxpayer from the lot owners having been received in trust for the specific purpose of caring for and maintaining burial places gave rise to no taxable income to the taxpayer. See *Appeal of Los Angeles Cemetery Association, supra.*

A marked difference between the *Springdale* case and this is found in the laws of the States within which the two cemeteries are located. The Springdale Cemetery was governed by the laws of Illinois. We stated in our opinion in that case that:

The taxpayer voluntarily set up a reserve based on an estimate, but there is lacking the clear evidence necessary to establish a trust. So far as the record shows, the directors might at any time reduce the fund or perhaps wipe it out, without restraint, their liability, if any, being one for breach of covenant or contract.

In the instant case the association is governed by the laws of the State of California. As we said in our opinion in the case of the *Los Angeles Cemetery Association, supra,* at pages 496 and 497:

Regarding contracts between cemetery corporations and lot owners, the statute provides as follows:

"Any cemetery corporation or association under contract for the perpetual care of a certain lot or lots in the cemetery of said corporation or association, is hereby expressly forbidden to use the funds received for the perpetual care of any lot or lots under such contract or contracts, for any other purpose than to provide the perpetual care mentioned in said contract, and it shall be the duty of the board of directors or board of trustees of a cemetery corporation or association receiving funds from perpetual care contracts to invest or reinvest such funds in bonds of the United States or the State of California, or in first mortgages on real estate, or in centrally located income producing improved real estate in any city or city and county in this State. (Civil Code, sec. 617.)"

We are clearly of the opinion that the purchase price of the burial lots in the Inglewood Cemetery was in each instance paid to the association under a contract, one condition of which required that a certain fixed percentage thereof should be used for the perpetual care of the lots purchased; that under the laws of California the association was expressly forbidden to use it for any other purpose, and that this constituted the amounts so received a trust fund from the very instant they passed into the hands of the association.

Having determined that 25 per cent of the amounts received from the sale of burial lots becomes a trust fund for the perpetual care of

such lots from the date of payment by the purchaser, it follows that issues 1 and 2 must be determined in favor of the petitioner. The additions to the principal of the trust fund were not income to the petitioner, and therefore can not be included in statutory invested capital as earned surplus. The income received from the investment of the trust fund can not properly be used for any purpose except perpetual care of burial lots sold by the petitioner. We are of the opinion that, like the principal amount of such fund, the interest thereon is not income, but is a liability for which the petitioner must account to the beneficiaries of the trust created by its acts and policies. In the instant proceeding, however, there is no evidence to enable us to identify this income, as it was used for corporate purposes, including the care of burial lots under the guaranty made to purchasers. The determination of the Commissioner as to this point, therefore, is not disturbed. *Greenwood Cemetery Association, supra.*

The parties agree that at March 1, 1913, the improved lands of the petitioner had a value of 41.65 cents per square foot, and that the cost of converting unimproved cemetery acreage into improved burial lots was 10 cents per square foot. Relying on this stipulation, the petitioner contends that the value of its unimproved cemetery acreage at March 1, 1913, was 31.65 cents per square foot. The Commissioner denies such value and has determined a value about one-tenth as great, or about $1,500 per acre.

In support of its contention for a high value at March 1, 1913, the petitioner adduced evidence that at that date restrictive ordinances of the City of Los Angeles, the City of Inglewood, and the County of Los Angeles, had been enacted and were then in effect, which assured it against competition thereafter. We are also asked to take notice of the great growth in population of the Los Angeles metropolitan district between 1906 and 1913, and the consequent rapid increase in the value of land. The Commissioner rejects the basis of value employed by the petitioner, and has determined that such unimproved acreage had a value of not more than $1,500 per acre at the basic date. We believe that the fair market value or price of this land lies somewhere between these very widely separated extremes, and have fixed the value of the petitioner's unimproved acreage of cemetery lands at March 1, 1913, at 15 cents per square foot.

*Judgment will be entered on 20 days' notice, under Rule 50.*

MURDOCK, PHILLIPS, SMITH and TRAMMELL concur in the result only.