CLEVELAND RAILWAY CO., PETITIONER, *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT.

Docket Nos. 10537, 12535.   Promulgated January 27, 1928.

*Atlee Pomerene, Esq., Andrew Squire, Esq., Fielder Sanders, Esq.,*
and *H. J. Crawford, Esq.,* for the petitioner.

*M. N. Fisher, Esq.,* for the respondent.

*Carl F. Sheeler, Esq.,* and *Alfred Clum, Esq.,* for the City of
Cleveland, as *amici curiae.*

314

318

OPINION.

LITTLETON: The principal issue in this proceeding is the determination of what constitutes the petitioner's income in a taxable year. The Commissioner contends that the petitioner is a corporation subject to tax under the provisions of section 232 of the Revenue Acts of 1918 and 1921; that its taxable net income should be determined in the ordinary way, namely, by treating all receipts as gross income and deducting therefrom those deductions allowed by statute, and that the remainder should be taxed as income irrespective of whether the net income so determined exceeded or was less than the 6 per cent permitted and required to be paid to its stockholders.

The petitioner claims that all sums received by the company from operation or profit on sale of property, over and above operating expenses, proper maintenance, renewal, depreciation and obsolescence allowances, interest on the bonded and floating debt, and a 6 per cent return to the petitioner or its stockholders, must be re-

turned to the car riders in reduced fare, and are therefore "ordinary and necessary expenses" paid or incurred during the taxable year in carrying on its business, and are deductible in computing net income under section 234 of the Revenue Acts; that any tax upon that portion of the interest fund over and above the return permitted to the company or its stockholders would "impose a loss or burden" upon the City of Cleveland, as representing the public; that in no sense can this excess over and above the permitted return to the petitioner or its stockholders under the franchise be regarded as taxable income.

Prior to the year 1900, the history of the street railway companies in Cleveland was not unlike that of other companies in other cities. For some time prior to the granting of the existing franchise, there were four distinct street railway companies in the City of Cleveland. In 1903 the Cleveland municipal authorities began a vigorous fight for the reduction of fares and the improvement of the service. Tom L. Johnson was then the mayor of Cleveland. He was an experienced and successful street railway operator and financially had been largely interested in the Cleveland Electric Railway Co. He announced as a part of his political program his purpose to secure 3-cent fare for transportation on the street railways within Cleveland and its suburbs. The Cleveland Electric Railway Co. was operating under a number of franchises, each covering separate sections and streets of the city, which were about to expire. The mayor and city council refused to grant renewals of expiring contracts except upon a 3-cent fare basis, and as a part of his campaign the mayor caused to be financed and built another competing 3-cent fare line. The fight for and against 3-cent fare continued for a period of about eight years. At one time Johnson got possession of and operated the whole system. The company through which he operated became financially embarrassed. A receiver was appointed by the United States Circuit Court for the Northern District of Ohio. The receiver continued the operations of those railways under order of the court for about one year and a half. The city council, at the suggestion of the court, passed an ordinance granting to the Cleveland Railway Co. a new franchise which became effective February 19, 1910, commonly known as the "Taylor Plan." Under it the Cleveland Railway Co. has been and is now operating the entire street railway system in the City of Cleveland. All the unexpired franchises were surrendered. Several amendments and extensions, and two renewals, have been made by the city council but the provisions are unchanged so far as they are related to the question of the Federal income or excess-profits tax.

The corner stone upon which the "Taylor Plan" and all the amendments thereto and the renewals thereof were constructed was

transportation at the cost of service. This cost of service includes operating and maintenance costs fixed by the City of Cleveland on a car-mile basis, interest on bonded and floating indebtedness and a return to the stockholders of 6 per cent on the outstanding capital stock. In fixing a return of 6 per cent it was provided that this would be paid in quarterly amounts and would not be dependent upon the earnings of the petitioner, but regardless of the amount earned, the return to the stockholders could not exceed 6 per cent.

The purpose of furnishing transportation at the cost of service is very definitely stated in the preamble to Ordinance No. 16238–A, granting the franchise to the petitioner. This reads in part as follows:

Whereas, it is the common desire of the City and the Cleveland Railway Company to have all the grants of street-railway rights in the City of Cleveland now outstanding surrendered and renewed upon terms hereinafter recited, to the end that the rate of fare may be reduced, the transfer privileges made definite, and the right of the City as to regulations and possible acquisition made certain; and

Whereas, it is agreed that a complete readjustment of the street-railroad situation should be made, upon terms that will secure to the owners of the property invested in street-railroads security as to their property, and a fair and fixed rate of return thereon, at the same time securing to the public the largest powers of regulation in the interest of public service, and the best street railroad transportation at cost, consistent with the security of the property, and the certainty of a fixed return thereon, and no more.

The ordinance placed a valuation on the assets as of the date of the acceptance of the franchise and provided that additional assets could only be acquired with the consent of the city. The franchise is in effect perpetual, but the city may by giving proper notice acquire the assets of the petitioner at the valuation plus 10 per cent. In the event of forfeiture, the city takes them over at cost.

As a part of the plan to give the street-car riders of the City of Cleveland transportation at cost, a fund known as the "interest fund" was created, which acts as a barometer to determine when and how the rate of fare is to be changed. In the event that the fund, established at $500,000, increases in the amount of $200,000, the fares are automatically lowered. If it should fall below $500,000 by a like amount the fares are automatically increased. That is, it was recognized that it was practically impossible to fix a rate of fare that would produce earnings exactly equal to the amounts which were agreed upon as representing cost of service. The method devised, however, provided a means by which excess earnings in one year or period would not only indicate that a reduction in fare should be effected, but also permit the use of the excess earnings to furnish lower fares in the succeeding year or period. Similarly, deficiencies in one year or period may be offset by increased fares in

the succeeding year or period. The terms of the ordinance with respect to increase of fare have been interpreted by the Supreme Court of Ohio and there held to provide that when the "interest fund" reaches the upper or lower specified amounts a change in fare must automatically be made. *City of Cleveland* v. *Cleveland Railway Co.*, (Ohio). Certiorari denied by Supreme Court of Ohio, April 30, 1918 (unreported).

Is the net income of petitioner, as the respondent contends, gross income less the deductions ordinarily allowable by statute under section 234, Revenue Acts of 1918 and 1921, or, is it an amount which is limited by the 6 per cent return to the stockholders of the petitioner? The amended returns submitted to the Commissioner by the petitioner were prepared on the basis that its net income for the taxable years was 6 per cent of its outstanding capital stock, plus nondeductible Federal taxes and the 2 per cent paid by it at source on tax-free-covenant bonds, regardless of whether the earnings in a given year were more or less than this amount. That this is not entirely its present position is shown by the following statement from its reply brief:

Counsel [for respondent] say, on page 7 of their brief:

"The taxpayer's position seems to be that nothing in excess of 6% of its capital stock in any given year can be income to it, and that it always has income of 6%, even though its net operating income is less than that amount."

This does not state our position. We have said, and say now, that the company is entitled to a net income of six per cent. The stockholders have a claim against it for six per cent, whether net income is earned or not. It so happens that this "return of 6%" has been given to the stockholders, in quarterly payments, though at times it has not been earned. The company has not objected to the payment of the taxes on this six per cent, earned or not earned, for the reason that the stockholders were entitled to six per cent return under the ordinance, and if the company did not pay the income tax on the six per cent and the stockholders received that amount, they would have to include it in their individual returns, if it was not taxed at its source. In truth, the company has at times paid more income tax than it was required to pay, and the government has received more than it was entitled to receive from the company, as distinguished from the stockholders.

To state the question in another way, does the fact that the stockholders have a claim against the corporation for a 6 per cent annual return, whether net income is earned or not, or that the company must reduce fares in a succeeding year because the fares charged in a given year have produced net income showing that service has been rendered in excess of "cost" as defined by the ordinance, serve to fix the taxable net income of the petitioner at 6 per cent of its outstanding capital stock?

While from an economic viewpoint or from the viewpoint of the petitioner when considered over a cycle of several years, there is undoubted merit to the proposition that the net income of a given

year may not reflect the exact status of the petitioner, yet when viewed in the light of the statute, we are of opinion that the petitioner's position is untenable. Under the Federal system of taxation, returns are rendered for income-tax purposes on the basis of a year (except in certain instances not material to this discussion) and not on a longer period such as we find, for instance, in Great Britain. Such a return includes all items of income for the year for which the return is rendered and all items of expense allowable as deductions. The statute defines the items to be included as "gross income" and also the items of expense to be allowed as "deductions" from gross income. The difference constitutes taxable income for a given year, regardless of the fact that there may be included therein accretions of income, for example, which may be said to have been accumulating in prior years, but which were not actually realized in a statutory sense until the taxable year. It is of course true that when petitioner's charges for transportation are less than cost in a given year, thus giving rise to less net income than contemplated by the ordinance, there arises an obligation to increase fares in the succeeding year, but this additional income of the succeeding year is income of that year and not of the prior year, for the reason that the income was earned in the succeeding year. Likewise, income earned in one year on account of charges for transportation in excess of cost results in an accumulation of earnings showing that fares should be reduced for the succeeding year and these earnings may be used to defray a part of the expenses for the succeeding year, but this does not alter the fact that a given amount of income was earned in the first year when a specific rate of fare was being charged.

The petitioner answers the situation with respect to the income in any year on account of excessive fares by saying that the amounts paid in, which represented payments at more than costs, are ordinary and necessary expenses which the petitioner, after receiving them from the car riders, is obligated to return in the form of reduced fares in succeeding years. That is, the petitioner says that these amounts which go into the "interest fund" and which can not be used for the payment of dividends, but which can only be used to reduce fares in succeeding years, are "ordinary and necessary expenses" in that the continued enjoyment of its rights under the franchise makes this action necessary and therefore constitutes, in effect, a part payment for use of the streets. In our opinion this argument is without force, for the reason that this income is at all times retained by the petitioner and is in no sense paid to the City of Cleveland. The payment that would constitute an expense and, therefore, be deductible, occurs when the fund is used for operating and maintenance costs, and interest charges. There is no return of the fund to the car riders who paid excessive fares, nor is it held

in trust to be paid to any one. The most that can be said is that the fares in the succeeding period will be less and a part of the expenses incident to the collection of these fares will be paid out of this interest fund, but until such payments are made or incurred, there has been nothing expensed that would constitute a deduction from gross income. To say that it would be a violation of the ordinance not to raise or lower fares as the amounts which are accumulated in the " interest fund " indicate that such action should be taken, and that therefore the doing of what the ordinance says is an ordinary and necessary expense, would in effect be saying that whatever a taxpayer is required to do in fulfillment of a contract is an ordinary and necessary expense. Admittedly, it was necessary for the petitioner to comply with the ordinance as a condition to its continuing in business under the franchise, but this does not make amounts required to be retained by it for use in a subsequent year or period an expense item and, therefore, a deduction when it has not in fact been expended. Each year must be dealt with as a unit. We can no more say that the amounts retained in this fund for use in a subsequent year's operation are expenses in the year when retained than we can say that the income of the subsequent year should be increased because a part of the expenses were paid from funds which had been accumulated for this purpose in the prior year. What is to be taxed is the income earned without regard to what may be distributed as dividends.

That the petitioner would not object to being taxed on more income than is earned in the " lean years " does not make taxable income that which is not taxable income under the statute. " Income " is defined in *Stratton's Independence* v. *Howbert*, 231 U. S. 399, as " the gain derived from capital, from labor, or from both combined." To the same effect are *Doyle* v. *Mitchell Bros. Co.*, 247 U. S. 179, and *Eisner* v. *Macomber*, 252 U. S. 189. The " net income " of the petitioner which is subject to tax under the Revenue Acts of 1918 and 1921 is " gross income " as therein defined, less the statutory deductions specifically enumerated. The period for which a return is to be rendered is defined in section 212 (b), as follows:

The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made upon such basis and in such manner as in the opinion of the Commissioner does clearly reflect the income. If the taxpayer's annual accounting period is other than a fiscal year as defined in section 200 or if the taxpayer has no annual accounting period or does not keep books, the net income shall be computed on the basis of the calendar year.

In *Atkins Lumber Co.*, 1 B. T. A. 317, the Board said:

Much stress was laid, both in the testimony on behalf of the taxpayer and in the argument of counsel, upon the fact that the total of all the company's operations from its inception in 1915 to its close in 1924, will result in losses. and that, therefore, apparent book profits for any given annual period, which profits have never been realized, should not be subject to income and profits taxes. It appears that the company's accounting system showed profits for the years 1919 and 1920, and it was argued that the following years of 1921 and 1922 showed losses, and that the apparent profits of 1919 and 1920 were more than exhausted by losses of the following years before such profits were in any sense realized by the stockholders of the taxpayer corporation. While this presents a situation which has a strong appeal, we can not overlook the fact that the taxing statutes have been designed to levy income and profits taxes upon the gains and profits of business for annual periods, and that each annual period must necessarily, under the provisions of the law, stand by itself, subject only to those provisions of the Revenue Acts of 1918 and 1921 permitting the adjustment of one year's net losses against another year's profits. But those provisions do not apply to the years 1919 and 1920 except as to losses of 1919. * * *

To hold, therefore, that something is taxable income in a given year which is not earned in that year (that is, does not represent gain derived in that year), or to allow deductions in one year which represent expenses of another year, would result in a determination of taxable income for a given year in a manner contrary to the taxing statutes.

The petitioner makes the further contention that the imposition of any tax upon that portion of the " interest fund " over and above the return permitted to the company or its stockholders would " impose a loss or burden " upon the City of Cleveland as representing the public, and, therefore, be contrary to the following provisions of section 213 (b) (7), Revenue Act of 1918, which provides for the exclusion of certain classes of income from " gross income ":

Income derived from any public utility or the exercise of any essential governmental function and accruing to any State, Territory, or the District of Columbia, or any political subdivision of a State or Territory, or income accruing to the government of any possession of the United States, or any political subdivision thereof.

Whenever any State, Territory, or the District of Columbia, or any political subdivision of a State or Territory, prior to September 8, 1916, entered in good faith into a contract with any person, the object and purpose of which is to acquire, construct, operate, or maintain a public utility, no tax shall be levied under the provisions of this title upon the income derived from the operation of such public utility, so far as the payment thereof will impose a loss or burden upon such State, Territory, District of Columbia, or political subdivision; but this provision is not intended to confer upon such person any financial gain or exemption or to relieve such person from the payment of a tax as provided for in this title upon the part or portion of such income to which such person is entitled under such contract.

While it is undoubtedly true that the levying of the tax in question will impose a burden upon the petitioner which in turn will mean

a burden to the car riders who use these transportation facilities, this is not a burden upon a " State, Territory, or the District of Columbia, or any political subdivision." . The burden is not on the City of Cleveland as such; no income is received by it from the operations of the petitioner, nor is it required to pay any of the petitioner's expenses, be they taxes or otherwise. The car riders of the City of Cleveland and its suburbs are in no sense a political subdivision, but are merely members of a community, or of several communities, which use the transportation facilities of the petitioner. The burden would indirectly fall upon them in their individual capacities, but not upon a political unit or subdivision in its sovereign or governmental capacity.

An examination of the legislative history of the provision in question reveals an intent on the part of Congress clearly opposed to this construction asked by the petitioner. The language used in the Acts of 1918 and 1921 in this connection does not differ in any material respect from the language of the Act of October 3, 1913.. In that Act the exempting clause is as follows:

*Provided further*, That there shall not be taxed under this section any income derived from any public utility or from the exercise of any essential governmental function accruing to any State, Territory, or the District of Columbia, or any political subdivision of a State, Territory, or the District of Columbia, nor any income accruing to the government of the Phillippine Islands or Porto Rico, or of any political subdivision of the Philippine Islands or Porto Rico : *Provided*, That whenever any State, Territory, or the District of Columbia, or any political subdivision of a State or Territory, has, prior to the passage of this Act, entered in good faith into a contract with any person or corporation the object and purpose of which is to acquire, construct, operate, or maintain a public utility, no tax shall be levied under the provisions of this Act upon the income derived from the operation of such public utility, so far as the payment thereof will impose a loss or burden upon such State, Territory, or the District of Columiba, or a political subdivision of a State or Territory ; but this provision is not intended to confer upon such person or corporation any financial gain or exemption or to relieve such person or corporation from the payment of a tax as provided for in this section upon the part or portion of the said income to which such person or corporation shall be entitled under such contract.

The above proviso was carried forward without material change into the Act of 1916 and that Act as amended by the Act of 1917 and is found in section 11 (b) thereof. The statute in the form substantially as that which the Board is called upon to construe has, therefore, existed from the inception of Federal income taxation. The Act of 1913, H. R. 3321, as first introduced in Congress did not contain any provision for exempting income to political subdivisions from utilities. When reported out by the Senate Committee on Finance it contained certain amendments including substantially the proviso here under consideration. (S. Rept. No. 80, Congres-

sional Record, vol. 50, p. 2513.) The Senate amendment was at first rejected by the House, but later that position was abandoned. (Congressional Record, vol. 50, p. 5227.) On October 2, 1913, the matter was debated on the floor of the Senate and reported in volume 50 of the Record, beginning with page 5320. The substance of the debate was, in general, whether or not the language used would exempt all public utilities. It is apparent that all of the Senators opposed any idea of enacting a bill that could be so construed. In the course of the debate, Senator Shivley stated: "The fact is that we were trying to draw the line sharply between the revenue derived by the corporation from its business and revenue *derived by the Government* from the corporation." Senator Shivley was defending the language of the bill and was a member of the committee which reported the bill. On page 5321, Senator Williams, a member of the committee, defended and explained the language of the proviso and responded to questions from Senator Burton of Ohio. The pertinent portions of the debate follow:

Mr. BURTON. I should like to ask another question * * *.

Suppose there is an arrangement under which a public utility, a street railway or a gas company, is to fix its rates so that it can make 6% interest on its investment, and no more. To take a concrete case, a street railway company operates under a 3-cent fare, and if by charging a 3-cent fare the income of the street railway company is brought down below 6% by the imposition of a tax, does the language which I have read mean that the tax is not to be paid?

Mr. WILLIAMS. No; it does not mean that.

Mr. BURTON. But it says:

"So far as the payment thereof would impose a loss or burden upon such State, Territory, or the District of Columbia, or a political subdivision of a State or Territory."

Mr. WILLIAMS. That would not impose a burden upon any State, Territory, or the District of Columbia; it would merely reduce the dividend of the company. To explain this, the State of Illinois, for example, receives 7 per cent from the Illinois Central Railroad; the city of Baltimore receives 9 per cent upon the gross earnings of all its street railways, or used to do so, and does so yet, I think; the city of New York has a contract whereby a certain amount of money was raised and it has a contract whereby it undertakes to hold harmless some of the street railways from all taxes, and then at the end of a certain period the railways become the property of the city of New York or the city has a right to go in and purchase them under certain circumstances. *In that case New York gets half, and the street railway gets half. The object is to exempt New York's half, and therefore, the language was put in below:*

"But this provision is not intended to confer upon such person or corporation any financial gain or exemption or to relieve such person or corporation from the payment of a tax as provided for in this section upon the part or portion of the said income to which such person or corporation shall be entitled under such contract."

Mr. BURTON. It is a different class of cases from those mentioned by the Senator from Mississippi to which I am referring. I am referring to cases which are becoming somewhat frequent now, where the value of the public utility owned by a private corporation is capitalized and a certain rate fixed,

say 60 cents per thousand cubic feet for gas, or 3 cents for fare in the case of street railroads, and those rates continue so long as the corporation can earn 5 or 6 per cent or whatever rate is agreed upon. Suppose the imposition of an income tax on the corporation brings down its earnings below 6 per cent, then the price for gas would have to go above 60 cents or the street-car fare above 3 cents. Does this provision apply in such a case?

Mr. WILLIAMS. Oh, does not the Senator see that, even if the fare had to go above 3 cents or the price of gas had to go above a certain figure, *it would not be the city that would be burdened; it would be the user of the gas and the travelers upon the street railway?*

Mr. BURTON. Is there not an identity between the city and the street-car users?

Mr. WILLIAMS. *This does not undertake to protect the people from all burdens.* We can not do that because every income tax puts burdens upon the people, although somebody else may pay them. All taxes, as the Senator is aware, are shifted more or less. (Italics ours.)

To carry the petitioner's argument to its logical conclusion would mean to exempt the petitioner from tax, since to levy any tax on this corporation would be to increase the "cost" of transportation, which in turn means increased car fares, and, therefore, impose a burden on the community of car riders to that extent. The difference between the burden imposed by the tax which the petitioner admits and that which the respondent seeks to impose is one of degree only.

The Board is of the opinion that the contentions of the petitioner for a limitation of its taxable income to a 6 per cent return on its outstanding capital stock, without regard to the income earned, as defined by the statute, must be denied.

The remaining contention relates to invested capital and arises by reason of the fact that the respondent reduced invested capital by the amount of petitioner's investment in its own stock, such investment being made out of the interest fund and pursuant to the directions of the city officials. The Board is of the opinion that the petitioner's stock purchased by it from money designated "interest fund" can not be considered as an asset for invested capital purposes. The interest fund belonged to the petitioner and constituted a part of its invested capital as surplus or otherwise for income-tax purposes, and the purchase by petitioner out of this fund of its own stock was no different for income-tax purposes than other cases considered by the Board wherein the corporation acquired its own stock. The reacquisition by petitioner of this stock represented the return to the stockholders of capital or surplus of the corporation. The fact that, for the purpose of determination of the rate of fare to be charged under the plan with the City of Cleveland, the stock was to be regarded as a part of the interest fund does not warrant the same being included in petitioner's invested capital at cost to it. *Simmons & Hammond Manufacturing Co.,* 1 B. T. A. 803; *Hutchins Lumber & Storage Co.,* 4 B. T. A. 705;

*Liberty Agency Co.*, 5 B. T. A. 778. In *Hutchins Lumber & Storage Co. supra*, the Board said:

It was a capital transaction involving a return to this particular stockholder of its capital contribution plus its share in the accumulated surplus, and the paid-in capital and surplus, of which these funds were a part, were lessened by the withdrawal of the same. The purchase by a corporation of its own capital stock eliminates the stockholder without substituting another in his place, repays to the withdrawing member his share of the capital, and reduces the amount of the fund contributed to the common venture.

Even if this stock could be considered as an asset at the hands of the petitioner, it would be an inadmissible asset under the statute. We affirm the Commissioner on this point.

Reviewed by the Board.

*Judgment will be entered for the respondent.*

GREEN, dissenting: I am unable to concur in the foregoing opinion. It seems to me that both legal and economic reasoning lead to an entirely different conclusion.

We should reject, as did the Supreme Court in *Southern Pacific Co.* v. *Lowe*, 274 U. S. 330, " the broad contention of the government that all receipts—everything that comes in—are income within the proper definition of the term ' gross income.' " We should consider, first, whether the receipts here under consideration are income within the meaning of the Sixteenth Amendment, and second, whether they are income within the meaning of the statute, for, as was said in *Towne* v. *Eisner*, 245 U. S. 425, " but it is not necessarily true that the income means the same thing in the constitution and in the act." Here, as in *Eisner* v. *Macomber*, 252 U. S. 189, we should analyze everything connected with the receipts and having a bearing upon their source and nature, and determine whether or not they are income within the meaning of the constitution, and we must carefully regard the truth and substance and disregard the form.

In *Eisner* v. *Macomber*, *supra*, the court had under consideration the question of what constituted income within the meaning of the constitution. " Income " is there defined as the " gain derived from capital, from labor, or both combined, including profit gained through sale or conversion of capital." On page 207, Mr. Justice Pitney, in the case just cited, said:

The Government, although basing its argument upon the definition as quoted, placed chief emphasis upon the word " gain " which was extended to include a variety of meanings, while the significance of the next three words was either overlooked or misconceived—" *derived-from-capital* ";  " the *gain-derived-from-capital* " etc. Here we have the essential matter; *not* a gain *accruing* to capital, not a *growth* or *increment* of value *in* the investment, but a gain, a profit, something of exchangeable value *proceeding from* the property, *severed from* the capital however invested or employed, and *coming in*, being " *derived* ", that is *received* or *drawn by* the recipient (the taxpayer) for his *separate* use,

benefit, and disposal; *that* is income derived from property. Nothing else answers the description. (Italics ours.)

See also *Merchants Loan & Trust Co.* v. *Smietanka*, 255 U. S. 509; *Eldorado Coal & Mining Co.* v. *Mager*, 255 U. S. 522; *Goodrich* v. *Edwards*, 255 U. S. 527; *Walsh* v. *Brewster*, 255 U. S. 536.

Section 213 (a) of the Revenue Act of 1918 is identical with section 213 (a) of the Revenue Act of 1921 and reads as follows:

SEC. 213. That for the purposes of this title (except as otherwise provided in section 233) the term "gross income"—

(a) Includes gains, profits, and income derived from salaries, wages, or compensation for personal service (including in the case of the President of the United States, the judges of the Supreme and inferior courts of the United States, and all other officers and employees, whether elected or appointed, of the United States, Alaska, Hawaii, or any political subdivision thereof, or the District of Columbia, the compensation received as such), of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. The amount of all such items shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under subdivision (b) of section 212, any such amounts are to be properly accounted for as of a different period; but  *  *  *

The receipts here under consideration must meet the test as prescribed by the statute and as prescribed by the Supreme Court in its interpretation of the constitution. The petitioner admits that it has income in an amount equal to 6 per centum on its capital plus nondeductible Federal taxes, plus the 2 per centum tax paid on its own tax-free-covenant bonds. The question is whether the remainder of its receipts are income. Have they the essential attributes? Have they the element of gain, of profit? Are they something of exchangeable value? Are they severed from the capital of the taxpayer?

In *Merchants Loan & Trust Co.* v. *Smietanka, supra*, the Supreme Court in discussing the definition set forth in *Eisner* v. *Macomber, supra*, expressed itself as "entirely satisfied with that definition." Further in their application of the definition to the facts in that case, they said: "It is palpable that it was 'a gain or profit' 'produced by' or 'derived from' that investment and that it 'proceeded' and was 'severed' or rendered severable from it by the sale for cash and thereby became that 'realized gain' which has been repeatedly declared to be taxable income within the meaning of the constitutional amendment and the acts of Congress." They further said with reference to the meaning of the word income and their definition thereof, "There would seem to be no room to doubt that the word must be given the same meaning in all of the Income

Tax Acts of Congress that was given to it in the Corporation Excise Tax Act, and that what that meaning is has now become definitely settled by the decisions of this court."

It should be borne in mind that the receipts here under consideration are not subject to the will of the corporation. They may not be distributed, their use is limited by and to the provisions of the franchise. The mere fact that these receipts may not be distributed as earned, is not in itself sufficient to take them out of the classification of income but that fact as it here appears, is of the greatest importance in applying the test prescribed by the Supreme Court. *The taxpayer has pledged itself to apply these receipts against the cost of service as soon as the accumulation reaches $700,000.* This situation has already arisen and the fund thus accumulated has already been so applied. It may arise again at any time. I do not see how it can possibly be said that these receipts in the hands of this taxpayer have an " exchangeable value " because, if for no other reason, they have not been and can not be " severed " from the fund and made available to the taxpayer. Note the language of Justice Pitney—"for his *separate* use, benefit, and disposal." *Separate use, separate benefit, separate disposal*—each of those words has a commonly accepted meaning. Are these receipts subject to the separate use, the separate benefit, the separate *disposal* of this taxpayer? Clearly they are not. They may not even be added to or included in the capital account upon which the petitioner is permitted to earn 6 per centum. In fact the excess receipts, by the terms of the franchise, serve to reduce the receipts for the succeeding period or periods in which the accumulations exceed $700,000. In them this petitioner has nothing definite, nothing tangible, nothing usable in the way of income. Their accumulation is a matter of no interest to the petitioner because no advantage is gained thereby. No gain or profit results from such an accumulation and it lacks several of the essentials of true income under the Sixteenth Amendment.

In the case of *Bourne* v. *McLaughlin*, 19 Fed. (2d) 148, the court, after quoting the definition from *Eisner* v. *Macomber*, said:

Gains arising out of dealings in property are not taxable unless they fall within the above definition of income. This is true whether the statute under which the tax is levied is that of 1916 or 1926. The explicit recognition of the principle that income is not realized unless it is received in a form which has an equivalence in cash, a realizable market value, found in the 1918 and subsequent statutes is not a restriction of the incidence of the income tax. It is merely an express statement of a principle inherent in the nature of income as recognized in *Eisner* v. *Macomber*, *supra*, in the statement that income must be " a gain, a profit, something of exchangeable value, proceeding from the property."

The statutory definition of gross income is phrased to include gains, profits, and " income derived from any source whatever." It

is clear that this definition is limited by the broad concept of income and that anything which is not income in the broad sense may not be gross income within the meaning of the statute. For example, if the thing received has no exchangeable value or if it has not been severed from capital, it may not be considered gross income under the statute. It seems to me that these receipts lack the essential attributes of income whether tested by the common concept of income or the statutory definition of gross income.

If these receipts are income, it does not follow that the Commissioner's determination should be approved. The last sentence of section 213(a) reads as follows:

The amount of all such items shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under subdivision (b) of section 212, any such amounts are to be properly accounted for as of a different period.

Section 212 (b) reads as follows:

(b) The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made upon such basis and in such manner as in the opinion of the Commissioner does clearly reflect the income. If the taxpayer's annual accounting period is other than a fiscal year as defined in section 200 or if the taxpayer has no annual accounting period or does not keep books, the net income shall be computed on the basis of the calendar year.

If a taxpayer changes his accounting period from fiscal year to calendar year, from calendar year to fiscal year, or from one fiscal year to another, the net income shall, with the approval of the Commissioner, be computed on the basis of such new accounting period, subject to the provisions of section 226.

In accordance with the last sentence of section 213 (a), the respondent has, both by regulation and decision, repeatedly permitted or required the accounting for income in a period other than that of its receipt. As to his action in this respect it is sufficient to call attention to article 36 of Regulations 45 relative to long-term contracts and article 44 of the same regulations relative to sales of real estate on the deferred payment plan.

Upon consideration of these receipts, the purposes to which they are pledged, and the limitations upon their use, I am convinced that if they are income (and in my judgment they are not) they may not be included in gross income in the year in which received unless and only to the extent that they are expended within the year. Such part as is not absorbed should be carried forward as deferred income until actually expended. The result of this conclusion is to limit income in any year to the amounts contended for by the petitioner.

SMITH, TRUSSELL, and LOVE concur in this dissent.