BOSTON ELEVATED RAILWAY COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 83489, 97991, 100480, 102555.   Promulgated December 9, 1941.

*Charles W. Mulcahy*, *Esq.*, and *Ward Loveless*, *Esq.*, for the petitioner.

*James T. Haslam*, *Esq.*, for the respondent.

914

## OPINION.

BLACK: In our preliminary statement of this report it was pointed out that the Commissioner rested his determination of the deficiencies upon the ground that the taxable net income of petitioner should be determined upon the so-called "leased road" basis, that is to say, upon the basis that the taxable net income of petitioner for each of said years consisted of the dividends paid during the respective years to the stockholders of petitioner under the provisions of the Public Control Act, plus the Federal income tax payable thereon. This being upon the theory that the Commonwealth of Massachusetts was operating petitioner's properties as lessee and was paying to petitioner as rentals therefor enough to cover dividends to stockholders and taxes.

There are expressions in respondent's brief, especially the first few pages thereof, which apparently are still arguing for the "leased road" basis of determining petitioner's net income. But be that as it may, under issue (1) of our report in *Boston Elevated Railway Co.*, *supra*, we rejected the "leased road" basis and held that the commonwealth was operating petitioner's properties for petitioner's account. We have been cited to no authorities which would cause us to reverse our decision in that respect. Accordingly we reaffirm it. We do not deem it necessary to repeat the reasons which we gave in that report for reaching our conclusions on that particular point. We refer to them as there given without repeating them here.

The next question which we have to decide, and the only one which we understand the pleadings and stipulation really submit to us for decision, is whether the payments made to petitioner by the commonwealth in each of the taxable years to cover deficits in its operating

expenses as defined in the Public Control Act, should be taken into petitioner's gross income for purposes of taxation.

We held in our former report, *Boston Elevated Railway Co., supra,* that petitioner should be taxed as any other corporation. Cf. *Cleveland Railway Co.,* 10 B.T.A. 310; affirmed on this point, 36 Fed. (2d) 347; certiorari denied, 281 U. S. 743. This holding we reaffirm. It is certainly the general rule that when a public utility corporation, under private ownership, receives payments from the state to reimburse it for deficits incurred in operation or as a guaranty of a fair return, the corporation must return such payments as a part of its gross income for taxation. *Gulf, Mobile & Northern Railroad Co.,* 22 B.T.A. 233; affd., 71 Fed. (2d) 953; affirmed on other issues, 293 U. S. 295; *Texas & Pacific Railway Co.* v. *United States,* 286 U. S. 285; *Helvering* v. *Claiborne-Annapolis Ferry Co.,* 93 Fed. (2d) 875.

The petitioner concedes that the above decisions would be applicable and would cause the income in question to be taxable to petitioner except for one fact, and that fact petitioner alleges, is that the payments in question were loans to petitioner by the commonwealth and that, although petitioner's obligations to repay such advances were only contingent, nevertheless such advances must be treated as loans for purposes of taxation and when so treated they do not go into petitioner's gross income for taxation.

We think a careful study of all the facts of these transactions does not support petitioner's contentions that the advances made to it in the taxable years which we have before us should be treated as loans. In the first place, petitioner's books of account did not treat them as loans. The last paragraph of the stipulation of facts which has been filed with us reads:

The monies received by the petitioner from the Commonwealth of Massachusetts, as set forth in paragraph IV hereof has [*sic*] been credited in every year to the account designated Profit and Loss.

It is, of course, true that bookkeeping entries are not conclusive. They are merely evidentiary. If the other facts in the record show that such advances were in fact loans to petitioner, then they should be so treated and the fact that petitioner credited them to its profit and loss account in each of the taxable years would not make them taxable income to petitioner. But an examination of these facts does not, in our opinion, demonstrate that these payments by the commonwealth to reimburse petitioner for its operating deficits, including dividends and taxes, were loans.

Petitioner in its argument lays much stress on the fact that prior to December 31, 1931, the petitioner had repaid to the commonwealth amounts equal to the sum of all payments theretofore made to the petitioner by the commonwealth for deficiencies, as defined in said

Public Control Act as amended. It is true that these repayments were made, as petitioner says, but they were made in substantial amounts from capital reserves hitherto set up by petitioner and from a trust fund known as the "West End Special Trust Fund." Subsequent to 1931 there was no longer any "West End Special Trust Fund", and also there were no funds in petitioner's reserve. It should be noted that section 5 of the Public Control Act required petitioner to set up a reserve of $1,000,000 out of a sale of $3,000,000 of its preferred stock.

Section 8 of the Public Control Act provided how this reserve fund and any additions thereto should be used. It reads as follows:

Section 8. The reserve fund shall be used only for the purpose of making good any deficiency in income as provided in section nine or for reimbursing the commonwealth as provided in sections eleven and thirteen, and until such use, may be invested in income-producing securities in the discretion of the trustees, and all income or interest received thereon shall be treated as part of the general income of the company.

This reserve which petitioner had established under the provisions of sections 5 and 9 of the Public Control Act was exhausted in 1931 and has not been restored in any amount. In fact there is no requirement that petitioner shall renew it by any further capital contributions. The only additions which might be made to petitioner's reserve fund would be from excess earnings which it might have in any particular year as provided in section 9 of the Public Control Act. During the taxable years which we have before us, petitioner had no excess earnings. Even if petitioner should have any excess earnings in the future, these earnings, as we understand the Public Control Act, would first go into petitioner's reserve to replenish the original reserve which was exhausted in 1931 before any of such reserves would be paid over to the Commonwealth of Massachusetts in repayment of its advancements. This we understand to be the meaning of the following language in section 11 of the Public Control Act (as amended by Special Acts of 1919, ch. 244). That part of section 11 as amended reads:

* * * If, as of the last day of any June thereafter during the period of public operation, the reserve fund *shall exceed the amount originally established*, the trustees shall apply the excess, so far as necessary, to reimbursing the commonwealth for any amounts which it may have paid to the company under the provisions hereof, and the commonwealth shall thereupon distribute the amount so received among the cities and towns in which the company operates, in proportion to the amounts which they have respectively been assessed as provided in section fourteen. [Italics ours.]

No provision is made that at the end of the period of public control, when petitioner's property is to be turned back to its own management and control, petitioner shall reimburse the common-

wealth for funds which it may have paid over to petitioner during the period of public control in making good its operating deficits. In fact, section 13 of the Public Control Act provides that if at the end of the period of public control the reserve originally established is less than it was when established, the commonwealth shall pay to petitioner sufficient funds to restore it to the original amount. Thus it will be seen that petitioner, having once established a reserve out of capital as it did in pursuance to section 5 of the Public Control Act, to be used in making repayments to the commonwealth, is under no obligation to make further payments into the reserve out of capital. Any additions to the reserve in the future must be made from excess earnings as provided in section 9 of the Public Control Act, and we do not think such an arrangement converts what otherwise would clearly be income payments, under the authorities which we have cited, into loans which would not be taxable.

We think that the requirement of the Public Control Act, that petitioner in years in which it has excess income shall pay such excess into a reserve fund to be used to repay the commonwealth, is somewhat similar to the provisions of section 209 of the Transportation Act of 1920 which required a railroad which had excess income during the guaranty period to pay such excess into the Treasury of the United States. Section 209 (d) of the Transportation Act of 1920 provided in part as follows:

*Guaranty in excess of minimum operating income.*—If for the guaranty period as a whole the railway operating income of any carrier entitled to a guaranty under paragraph (1), (2), or (4) of subdivision (c) of this section is in excess of the minimum railway operating income guaranteed in such paragraph, such carrier shall forthwith pay the amount of such excess into the Treasury of the United States. * * * The amounts so paid into the Treasury of the United States shall be added to the funds made available under section 72 for the purposes indicated in such section. * * *

The Supreme Court, in *Texas & Pacific Railway Co.* v. *United States, supra,* in speaking of the provisions of section 209 of the Transportation Act of 1920, including the above quoted provision, among other things, said:

* * * If the fruits of the employment of a road's capital and labor should fall below a fixed minimum, then the government agreed to make up the deficiency, and, if the income were to exceed that minimum, the carrier bound itself to pay the excess into the federal treasury. In the latter event, the carrier unquestionably would have been obligated to pay income tax measured by actual earnings; in the former, it ought not to be in a better position than if it had earned the specified minimum. Clearly, then, the amount paid to bring the yield from operation up to the required minimum was as much income from operation as were the railroad's receipts from fares and charges.

Whether petitioner, in a year when it has excess earnings and pays some of these excess earnings into a reserve to be used under certain

conditions in making repayment of advances made by the commonwealth, would be entitled to a deduction therefor on its income tax return, we do not now decide. We have no such payments in any of the taxable years which are before us. The petitioner, in support of its contention that the payments in question from the commonwealth were loans and should not be taken into petitioner's gross income, relies upon the Board's decision in *Boston Elevated Railway Co.*, *supra*.

In our decision in that case, we upheld petitioner's contention that a payment of $1,775,338.80 which it received from the commonwealth, July 15, 1932, similar to the payments which petitioner received from the commonwealth in each of the taxable years now before us, was a loan and therefore should not be taken into petitioner's gross income. Our decision in that case was largely based upon the court's opinion in *Island Petroleum Co.* v. *Commissioner*, 57 Fed. (2d) 992; certiorari denied, 287 U. S. 646, affirming 17 B. T. A. 1.

A further study of the law and facts connected with the payments by the commonwealth to petitioner, which, as we have already pointed out, petitioner credited in each year to its profit and loss account, convinces us that these payments should not be characterized as loans. Therefore, our reliance in our former opinion on the *Island Petroleum Co.* case, and the other cases cited, was in error. We think that under authority of *Gulf, Mobile & Northern Railroad Co.*, *supra;* *Texas & Pacific Railway Co.* v. *United States, supra;* and *Helvering* v. *Claiborne-Annapolis Ferry Co.*, *supra*, we must hold that the payments which petitioner received in each of the taxable years to make good petitioner's operating deficits as that term was defined in the Public Control Act were taxable income in the year received. Cf. *Lykes Bros. Steamship Co.*, 42 B. T. A. 1395.

Another reason which leads us to this conclusion is that the $1,193,970 dividends which petitioner paid to its stockholders in each of the taxable years would not be taxable income to the recipient stockholders if paid out of capital, except to the extent that such payments might exceed the cost basis of the stock. It seems plain, however, that it was not the intention of petitioner to pay dividends out of borrowed capital, but out of earnings which were made up in part from its regular receipts from fares and charges to passengers and in part from receipts from the commonwealth. To the extent that our decision in *Boston Elevated Railway Co.*, *supra*, is in conflict with our holding herein, it will no longer be followed.

Petitioner makes an alternative contention which we think must be sustained. Petitioner says in its brief:

* * * It is further submitted that, even if the Board should overrule its prior decision and hold that the amounts received from the Commonwealth

are taxable, the respondent's determinations as set forth in his deficiency letters should not be sustained, but, in such case, the net income of petitioner should be computed in accordance with the terms of Paragraph 3 of the stipulation of the parties.

Paragraph III of the stipulation has been incorporated in its entirety in our findings of fact. Notwithstanding this paragraph, the respondent attempts to support his determination as to the amount of net income by contending that we should disregard entirely the actual amounts paid to petitioner by the commonwealth in the respective taxable years and substitute in their place so-called accrued amounts as of the close of each calendar year equal to (1) the "deductions in excess of gross income" set forth in paragraph III of the stipulation, (2) the annual dividends paid of $1,193,970, and (3) the Federal income tax on the annual dividends. Clearly there is no basis for such a contention. The amounts paid to petitioner in each of the taxable years by the commonwealth could not be accrued by reason of section 11 of the Public Control Act, as amended, until the last day of June for the years 1933 and 1934 or the last day of March for all years subsequent to the year 1934. *Spring City Foundry Co.* v. *Commissioner*, 292 U. S. 182. These accruals correspond with the actual amounts paid to petitioner in each of the taxable years by the commonwealth. These amounts should be used in a computation under Rule 50.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

----

MELLOTT, concurring: While I concur in the holding of the majority that the amounts received from the commonwealth during the taxable years can not be characterized as loans, I am of the opinion that the discussion of the "leased road" theory, upon which the Commissioner relied in making his determination, is inadequate. His contention, with which I find myself in agreement, is that the various acts of the legislature created two separate and distinct entities— Boston Elevated Railway Co. (lessor) and Boston Elevated Railway Co. Public Trustees (lessee). If that be so then the amounts paid for the use of the property, albeit paid in the form of dividends to petitioner's stockholders, constituted income to petitioner.

----

VAN FOSSAN, dissenting: I dissent from the holding that the payments by the commonwealth constituted income to the petitioner.