*1305 OPINION.
Phillips :
The first question to be considered is that raised by the petitioner, Sand Springs Railway Co. It contends that it is not taxable upon the income derived from its franchise to supply electric light and power to the city of Tulsa, its contention being based upon three separate grounds: (1) It held all such income, as soon as earned in trust for the Sand Springs Home; (2) such income should be excluded from gross income under section 213 (b) (7) of the Revenue Acts of 1918 and 1921; and (3) if such income is taxable to it, the net receipts from the franchise are deductible from gross income under section 234 (a) (1) of said revenue acts “as rentals or other payments required to be'made as a condition to the continued use ” of the franchise.
We have heretofore held that the Sand Springs Home was exempt from income tax for the year 1922 under the provisions of section 231 (6) of the Revenue Act of 1921. Sand Springs Home, 6 B. T. A. 198. Since the Home was operated in each of the taxable years before *1306 us in the same manner as during the year 1922 and since the provisions of the revenue acts which governed during each of such years were substantially similar to those of the Revenue Act of 1921, we conclude that the Home was exempt from taxation during each of the years before us and proceed to our further discussion upon that basis.
The situation presented is unusual. In 1912 the Railway Co. was the owner of a franchise permitting the' operation of an interurban railway for the conveyance of passengers, parcels, freight, expressage and mail upon lands of the city of Tulsa located outside its corporate limits and upon certain streets within the city of Tulsa from the city limits to a point known as the Third Street viaduct. In October, 1912, the city of Tulsa adopted Ordinance 1059 which granted a franchise to the Railway Co. to extend its lines farther into the city of Tulsa and to supply the city of Tulsa and its inhabitants with electricity. The franchise recites a resolution adopted by the board of directors of the Railway Co. providing that the net profits arising from the sale of electricity within the limits of the city of Tulsa shall be paid to the treasurer of the Sand Springs Home on the fifteenth day of each month. The franchise provides that the city may inspect the books of the company to prevent evasion of this resolution and further provides that should the Railway Co. rescind such resolution or fail to carry out its intent, the franchise shall terminate. The Railway Co. accepted the franchise and thereby bound itself to furnish electricity as provided in section 5 and other sections of the ordinance.
The respondent takes the position that no trust was created; that there was a mere naked promise to give certain income to the Sand Springs Home and that the one penalty which it would have suffered had it refused to pay the profits over to the Home would have been the forfeiture of the franchise. It is asserted that in accepting the franchise the corporation undertook to operate a business from which it could hope to derive no profit, that this was done because its sole stockholder was interested in the charitable work done by the Home and that the effect of the whole transaction was the .same for tax purposes as if the corporation had earned profits which it had declared as dividends and paid to the Home upon the instruction of its stockholder.
We are of the opinion that this is based to some extent upon an incorrect construction of the franchise. This franchise grants to the Railway Co. two privileges, one to extend its railway lines and the second to furnish electricity. The first was to be exercised by the petitioner for its own profit; the second for the benefit of the Home. The Railway Co. had no option to accept one and reject the other. *1307 It could either accept or reject the franchise as a whole and its acceptance of the privilege to extend its railway lines necessarily involved the obligation to distribute and sell electricity and pay over the profits to the Home. It is possible that the city of Tulsa would have granted a franchise to extend the railway lines. It is possible that it would have granted a franchise to transmit and sell ele.ctrid.ty for the benefit of the Railway Co. It is possible that the franchise was drawn in the form in which accepted solely because of the interest of the stockholder of the Railway Co. in the Home and not because of any interest on the part of the city officials. On the other hand, it is possible that the city officials were interested in seeing that the Home was supported and that the arrangement set out in the ordinance was a factor which weighed heavily in favor of granting the franchise sought by the petitioner. The fact is that the Railway Co. accepted an ordinance giving it the right to extend its tracks within the city and permitting and requiring it to transmit and sell electricity, the entire franchise to terminate should it not pay over to the Home the profits from the sale of electricity. We have here a conveyance to the petitioner of what appears to be a valuable property right upon the agreement of the petitioner to pay over to a third party the income from a certain part of the property so conveyed. Upon the termination of the franchise the privileges conveyed revert to the city. The Railway Co. had no equitable or beneficial interest in that part of the franchise which permitted the sale of 'electricity. It may be that a trust could be spelled out, and would be if necessary to carry out the arrangement made by the parties, although the situation is complicated by the fact that the Railway Co. was undoubtedly required to invest a part of its own capital. For this reason the income flowed not only from the franchise granted to the Railway Co. but in part from this investment of its capital.
We think it unnecessary, however, to determine whether or not the net income from the sale of electricity was received by the Railway Co. as a trustee and was therefore not a part of its income. Troost Avenue Cemetery Co. v. United States, 21 Fed. (2d) 194; American Cemetery Co. v. United States, 28 Fed. (2d) 918; Portland Cremation Association v. Commissioner, 31 Fed. (2d) 843; Los Angeles Cemetery Association, 2 B. T. A. 495. Assuming that the respondent is right in his contention that there is no trust, it nevertheless appears that in order to prevent termination of the franchise and consequently of the right to operate its street cars within that portion of the city of Tulsa specified in the ordinance, the Railway Co. was under the necessity of paying over the net profit from the *1308 sale of electricity to the Home. This falls squarely within the provisions of sections 234 (a) (1) of the Revenue Acts of 1918 and 1921, which provide for the deduction of “ all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * * including rentals or other payments required to be made as a condition to the continued use or possession of property to which the corporation has not taken or is not taking title or in which it has no equity.” While it may not be the ordinary situation for a business corporation to pay a part of its entire profits or all of its profits from a certain part of its business to a charitable corporation as a condition to the use of city streets, a payment for that purpose is clearly an ordinary and necessary expense of the business. Huff, Andrews & Thomas, 1 B. T. A. 542; Louis C. Rollo et al., 20 B. T. A. 799. See also United States v. Kellogg, 274 Fed. 903; Alfred LeBlanc, 7 B. T. A. 256.
We do not mean to hold that such contracts must not be scrutinized to determine whether such payments as those with which we are here concerned are in fact made for the use of property, or whether the form is adopted merely as a subterfuge. The respondent takes the position that the surrounding circumstances show that the city had no interest in the profits of the lighting business beyond a payment to it of 4 per cent of the profits and points out that when the franchise to supply electricity was sold by the Home the clause regarding the profits to be paid to the Home was stricken out by the city. We do not understand that the respondent contends that the removal of this clause from the franchise in a later year affected the legal obligations of the years before us, but rather that it is evidence that the clause was inserted at the request of the sole stockholder of the Railway Co. and might have been removed at any time at his request. In other words, the contention is that the provision for the Home was a voluntary act on the part of the Railway Co. and its sole stockholder, was nothing in which the city was interested and was no part of the necessary expenses of the company. The argument, so far as it is based on the subsequent modification of the franchise, loses its force when it is considered that the Home received the entire amount for which the franchise, as modified, was sold, presumably realizing in this way what all parties concerned considered an adequate recompense for the future profits.
In considering whether the payments provided for in the franchise were in fact made for the use of the property or whether the form was adopted merely to permit the profits to be paid over to the corporation in which the sole stockholder was the principal benefactor, weight must be given to the public nature of the transaction. The official acts of the governing body of a city should be accepted as bona fide until the contrary clearly appears. No sufficient reason *1309 appears for holding that the payment to the Home was other than what it purports to be, viz., a payment which the Railway Co. was required to make if it was to continue to enjoy the franchise. City officials are naturally and properly interested in charitable corporations whose works relieve the city of a part or the whole of its duty to provide for those who are public charges. There is no suggestion that the relationship between the company and the city was such that if it had failed to make the prescribed payments it would nevertheless have been permitted the continued enjoyment of the franchise. It must be assumed that the city officials would have performed their duty and taken steps to enforce the termination of the franchise.
We are of the opinion that in computing the net income of the Railway Co. the Commissioner overstated such income for each of the years before us by the amount which accrued to the Home under the contract, viz., the net profits arising from the distribution and sale of electricity. While the amount of such net income is not stated in the stipulation filed by the parties, it is stipulated that the revenue agent made a separate computation of this income which the respondent included in his computation without change. It is this amount which is to be eliminated.
We come nest to consider whether the petitioner, Sand Springs Railway Co. is entitled to deduct $18,000 in each of the years before us as interest paid upon indebtedness. It appears that in 1912 the Sand Springs Railway Co. issued first mortgage bonds in the sum of $300,000. Its president, Charles Page, turned these bonds over to the Sand Springs Home. During each of the years involved the Railway Co. paid $18,000 to the Home as interest upon these bonds and claims this amount as a deduction in computing its income. The respondent-disallowed this deduction on the ground that the payment was “ in the nature of a gift.” At the hearing counsel for the petitioner made the following statement with respect to this issue:
The third issue which carries through all these years is that of the interest on bonds of the Sand Springs Railway. As I have said, Mr. Page was a benefactor of the Sand Springs Home and was a stockholder of the Sand Springs Railway. The Sand Springs Home needed some running income and Mr. Page caused the Railway Company to issue to him $300,000 face value of mortgage bonds, regular ordinary bearer bonds. There is a sample bond which will be in evidence with the stipulation similar to one of the others. Whether or not any consideration ran from Mr. Page to the Railway Company for the issuance of those bonds has been a matter that has been controverted between the taxpayers and the Bureau, but we offer no evidence to show that Mr. Page worked for the Railway Company without salary or that the Railroad Company owed him money on account of having assigned to it rights of way he acquired in his own name and things like that. For a time there was an effort on the part of the representatives of the taxpayers to show that an equivalent quid, pro quo went from Mr. Page to the Railway Company for the *1310 issuance of those bonds, but we are satisfied to stand on the proposition that the bonds, whether they were a gift from the Railroad Company to Mr. Page or whether they were received for a valid consideration, in the hands of the Home constituted a valid obligation * * ⅜ our position is that the statute provides for the deduction of interest paid and this was interest paid.
Later in the hearing while the parties were offering their evidence counsel called attention to a stipulation of the parties made during the course of the taking of a deposition to the effect that if a certain witness were called he would testify, subject to objection, that certain statements were made to him by Page with respect to the circumstances under which the bonds were issued. Counsel for the petitioner then made the following statement:
As to whether it is admissible as an admission against interest or whether it constitutes hearsay is something I do not think the Board will really have to rule on, because we have not offered any evidence to show that the Sand Springs Railway Company got from Mr. Page any equivalent consideration when it issued the $300,000 of bonds to him, and it makes little difference whether he said or did not say what Proctor alleges, the question being reduced to one of law, assuming that the bonds were a gift, is the income on them deductible.
In view of the determination of the Commissioner that the so-called interest was in the nature of a gift and the statements made by counsel for petitioner at the hearing, it would appear that there now remains no room for any argument as to whether or not the bonds, under seal, purport consideration or whether the burden is on petitioner or respondent to prove consideration or its lack, or that the bonds were issued as a dividend. Upon the record before us we must assume that the bonds were issued by the Railway Co. to Page as a gift.
It is generally recognized that the issuance, without consideration, of a- promissory note is nothing more than a promise to make a gift and therefore unenforcible in the hands of the payee. Simon Benson, 9 B. T. A. 279. The Home, having acquired the notes from Page by gift, does not have the rights which, under the law of negotiable instruments, would accrue to one who had purchased in due course for a consideration and without notice. It took the notes subject to any defense which could have been urged against them while in the hands of Page.
The petitioner further urges that contracts are enforced in favor of charitable corporations regardless of consideration. We know of no decision which goes so far, nor does counsel cite any. There are decisions which hold that subscriptions to charitable corporations may be enforced regardless of consideration, but the more generally accepted bases for enforcing such subscriptions are that a consideration results from the subscriptions of others or that grounds exist which estop the subscriber from relying upon a want of con *1311 sideration. The bonds having been issued to Page, the case before us does not fall within the principles which control subscriptions to charities. The later gift to a charitable corporation does not cure the infirmity which existed at the time of issuance. We are of the opinion that the record establishes no enforcible indebtedness upon these bonds upon which the Railway Co. was required to pay interest. The action of the Commissioner is affirmed.
The next question for consideration is whether the Sand Springs Power, Light & Water Co. and the Sand Springs Gas Co., after the transfer of all their stock to the Sand Springs Home on December 31, 1919, are exempt from taxation. Several grounds for exemption are urged. It seems clear to us that these companies were not “ organized and operated exclusively ” for the purposes mentioned in section 231, subdivision (6) of the Revenue Acts of 1918, 1921, 1924, and 1926. Nor are these corporations mere holding companies, such as are described in subdivision (12) of the 1918, 1921, and 1924 Acts and subdivision (13) of the 1926 Act. That there is in these acts a provision by which exemption is granted to holding companies whose entire profits are turned over to exempt corporations would indicate an intent on the part of Congress not to grant exemption to other corporations whose profits might be similarly used.
It is further contended that, since the Home owned all the stock of the Water Co. and of the Gas Co., the Home and these corporations were affiliated within the meaning of section 240 (b) of the Revenue Act of 1918 and section 240 (c) of the Revenue Act of 1921, with the result that the identity of these two public service corporations was merged in that of the Home and their income became exempt from income and profits tax. These sections provide:
For the purpose of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially all the stock of the other or others, or (2) if substantially all the stock of two or more corporations is owned or controlled by the same interests.
Petitioners plant themselves on the literal provision of the above subdivision and assert that the Home, the Water Co., and the Gas Co. are domestic corporations and that since the Home owned all the stock of the other two, except the qualifying shares, they should be deemed to be affiliated. If we apply an equally literal construction to section 230 of the same revenue acts we would be compelled to hold that the income of the Home is taxable, since that section provides “ there shall be levied, collected and paid * * * upon the net income of every corporation ” a certain rate of tax. That “ every corporation ” is not to be taxed is evident from the provisions of section 231 of the Revenue Acts of 1918 and 1921. All *1312 relevant sections of each act must be construed together so that they may harmonize and at the same time avoid if possible any absurd result.
Section 240 (a) of the Revenue Act of 1918 provides:
That corporations which are affiliated within the meaning of this section shall, under regulations to be prescribed by the Commissioner with the approval of the Secretary, make a consolidated return of net income and invested capital for the purposes of this title and Title III, and the taxes thereunder shall be computed and determined upon the basis of such return.
Section 240 (a) of the Revenue Act of 1921 differs from the above provision in that no reference is made in the latter to invested capital.
The Home was not subject to income and profits tax and under section 239 of both revenue acts was not required to make a return. It could not have been the intent of Congress to require it to make a return simply because it owned all the stock, except the qualifying shares, of the Water Co. or of the Gas Co. The provision for consolidated returns does not purport to do more than prescribe a method for returning income and computing the amount of the tax. It imposes no tax and grants no exemption. It is administrative in character and does not alter the substantive provisions of the law.
Furthermore, it would appear that the contention made by the petitioner would have to be denied under the express terms of section 240, which provides for a consolidated return of “ net income.” In defining the words “ net income ” as applied to a corporation, the revenue acts limit the term to “ the case of a corporation subject to tax.” Section 232, Revenue Acts of 1918 and 1921. The Home could have no net income within the statutory definition. It would seem clear that the provision for a consolidated return of net income can have no application to a corporation which can not possibly have net income. We conclude that the provisions for a consolidated return do not serve to exempt from tax the income of the Water Co. and the Gas Co.
Next it is urged that we should construe all the provisions of section 231 liberally and hold that the income of the Water Co. and of the Gas Co. is exempt under their cumulative effect, citing Y. M. C. A. Retirement Fund, Inc., 18 B. T. A. 139. If we may assume, contrary to the general rule that exemptions are to be strictly construed, that the provisions exempting charities should be given a liberal construction, it would still appear that the most liberal construction is insufficient to cover the exemption sought. We should have to read into the law something which we do not find there. Such is not construction, but legislation. Further, we would repeat at this time that the provision exempting holding companies whose *1313 entire income is paid over to charities evidences an intent not to exempt operating companies.
Lastly, it is asserted that we should disregard the corporate entities of the Gas Co. and Water Co. and hold that their incomes were earned by the Home. In this connection it is urged that since under its charter the Home had the authority to operate as a public, utility company and could have performed the same functions as those performed by these two companies, and since it owned all their stock except the qualifying shares, we should hold that they were but arms of the charity. We can not accept this view. Congress has provided the extent of the exemption and neither of these companies falls within it. It is evident that Congress had in mind that charities might use subsidiaries and provided for the exemption of such as were mere holding companies. To permit other subsidiaries, which do not fall within any of the exemptions, to escape tax upon their income would be to disregard the statutory limitation on exemption. See also Curran v. Arkansas, 15 How. 304, where the' court said:
That a State, by becoming interested with others in a banking corporation, or by owning all the capital stock, does not impart to that corporation any of its privileges or prerogatives, that it lays down its sovereignty, so far as respects the transactions of the corporation, and exercises no power or privilege in respect to those transactions not derived from the charter, has been repeatedly affirmed by'this court, in Bank of United States v. The Planters Bank, 9 Wheat. 904; Bank of Kentucky v. Wistar et al., 3 Pet. 431; Briscoe v. The Bank of Kentucky, 11 Id. 324; Barrington et al. v. The Bank of Alabama, 13 How. 12.
The action of the Commissioner in subjecting the income of the Water Co. and the Gas Co. to tax is approved.
At the hearing counsel for the respondent was granted permission to amend his answer to allege that the Water Co. and the Gas Co. continued to be affiliated with the other petitioners after the stock of those two companies was transferred to the Home. In his brief the respondent concedes, properly, that no such affiliation existed.
By agreement of counsel and consent of the Board only such issues were tried in the proceedings known as Docket Nos. 85103 to 35106, inclusive, as related to the questions of affiliation, discussed above. Other questions exist in those proceedings, but these the parties believed might be disposed of by stipulation after the decision upon the affiliation issue. These cases will be held under submission until a decision under Bule 50 is entered in Docket Nos. 32438, 32439, and 39959. If not settled by stipulation by that time they will be restored to the calendar for further hearing.
Reviewed by the Board. ■
Decision will be entered, wnder Rule 50 in Docket Nos. 32438, 32439, and 39959.