Wallace T. BRUCE and Katharine D. Bruce, Plaintiffs,

v.

A. R. KNOX, Former District Director of Internal Revenue, Defendant.

WALLACE T. BRUCE, INCORPORATED, Plaintiff,

v.

A. R. KNOX, Former District Director of Internal Revenue, Defendant.

Nos. 4–59 Civil 55, 4–59 Civil 57.

United States District Court
D. Minnesota,
Fourth Division.

Jan. 25, 1960.

Richard S. Larson and W. B. McCallum, of Wheeler, Fredrikson & Larson, Minneapolis, Minn., for plaintiffs.

Charles K. Rice, Asst. Atty. Gen., Robert Kapp, Lyle M. Turner, Myron C. Baum and Robert Livingston, Attys., Dept. of Justice, Washington, D. C., and Fallon Kelly, U. S. Atty., St. Paul, Minn., for defendant.

NORDBYE, District Judge.

The above actions came before the Court on the respective motions of each of the parties for summary judgment.

These actions involve petitions for refund of income taxes paid by the plaintiffs. In that the same legal questions arise in each case, they will be considered together.

Wallace T. Bruce, one of the taxpayers, received in 1948 as a gift from his mother an undivided two-thirds interest in an undeveloped 37-acre tract known as Cedar Lake land located in St. Louis Park, Minnesota. It appears that Bruce's mother had paid $2,078.20 for her interest. Later, in 1949, Bruce purchased for $4,500 the remaining undivided one-third interest. Bruce and his wife, Katharine, were in the construction business as partners, and at or about this time a corporation known as the Bruce Construction Company was formed to take over this business, which was devoted primarily to the erection of dwelling houses. The Cedar Lake land remained undeveloped until 1952. During that year or thereabouts, the St. Louis Park School Board had made some inquiries as to the possibility of acquiring this land for a school site. When the School Board was informed by Bruce that he would not voluntarily sell the land for $200,000, no further negotiations were carried on, but there was a possibility that condemnation proceedings might be commenced by the School District. In any event, Bruce, because of his familiarity with the business of building and selling homes, evidently recognized the possibilities of the land for platting, subdividing and selling lots for home construction. With this idea in mind, he caused a corporation to be formed on April 1, 1952, known as Wallace T. Bruce, Inc., one of the taxpayers herein, for the purpose of developing the land in question. On April 14, 1952, at the first meeting of the Board of Directors of Wallace T. Bruce, Inc., hereinafter referred to as Bruce, Inc., the issue of 110 shares of common capital stock to Wallace T. Bruce for a total subscription price of $11,000, the par value of each share being $100, was approved. At the same meeting, there was approved a "purchase agreement" under which Bruce was to transfer the Cedar Lake land to Bruce, Inc., for a consideration of $198,000. The terms of the agreement provided that Bruce, Inc., was to pay $10,000 as earnest money, $10,000

on September 30, 1952, and $10,000 quarterly thereafter until the principal and interest at the rate of 4½ per cent on the unpaid principal balance was paid. According to the affidavit of Wallace T. Bruce, which is on file herein, "The installment payments were scheduled under the purchase agreement to correspond with the anticipated schedule of development of the tract." On July 3, 1952, a building contract was entered into between Bruce Construction Company and Bruce, Inc. The Bruce Construction Company agreed to construct dwellings on the tract and was to receive from Bruce, Inc., as compensation a reimbursement of its costs directly allocable to the construction of each dwelling and, in addition, its expense incurred in the improvement of the entire tract. Furthermore, the agreement between the two Bruce corporations provided that Bruce Construction Company was to receive $1,100 for each dwelling completed and sold. The initial expense, however, of platting, subdividing, and grading streets, together with sales expense in selling lots, was to be borne by Bruce, Inc. Most of the cost involved in the development of the tract would be payable only as additional portions of the tract were developed and sold.

Wallace T. Bruce, the only stockholder in Bruce, Inc., paid $11,000 for his stock, of which $10,000 was immediately returned as the down payment on the land as earnest money. So in effect the obligation which Bruce, Inc., made with reference to its earnest money payment was satisfied by the issuance to Bruce of common stock in the par value of $10,000. Thus, it appears that Bruce, Inc., was supplied only with $1,000 cash when the development of the tract as planned was to be carried forward. No money was available to Bruce, Inc., on September 30, 1952, when the first payment was due, and it appears that no actual cash payments ever were made by Bruce, Inc., to Bruce on the land contract. It does appear, however, that Bruce, Inc., gave its demand note for $40,000 to Wallace T. Bruce on July 1, 1953. This note

bore interest in excess of 4½ per cent. Moreover, it appears that another demand note for $38,400 was issued to Wallace T. Bruce on September 1, 1953, by Bruce, Inc., and again at a higher rate of interest than that scheduled in the so-called purchase contract. Apparently these notes were used by Bruce for the purpose of obtaining loans at his bank. Moreover, it appears that on June 30, 1954, Bruce Construction Company gave Bruce, Inc., its note for $101,355.39. This note was distributed to Wallace T. Bruce in partial satisfaction of the moneys allegedly due him under the purchase agreement. But the same note was subsequently returned by Wallace T. Bruce to the Bruce Construction Company, evidently in connection with some transaction between Bruce and the Bruce Construction Company, of which latter company he and Katharine Bruce were the sole stockholders. On the same day of this note transaction, Bruce, Inc., deeded to Wallace T. Bruce a portion of Cedar Lake land which Bruce was to utilize for the purpose of a shopping center and in connection with this transfer Bruce, Inc., received a credit of $11,-350.50 on its so-called purchase agreement. It is to be gathered from the showing made by plaintiff that no further payments were made to Bruce until June 30, 1955. At that time there was eliminated a liability of the Bruce Construction Company to Bruce, Inc., in the amount of $29,569.60. That amount was applied by Bruce, Inc., in partial satisfaction of the alleged contract price due Wallace Bruce under the purchase agreement, in that at or about that time, and as a part of the transaction, Bruce Construction Company cancelled an indebtedness of $29,569.60 due it from Wallace T. Bruce. No other credits were made on the Bruce, Inc., purchase contract during the year ending June 30, 1956. Although the transactions resulting in credits to Wallace T. Bruce on the so-called purchase contract between him and Bruce, Inc., during the relevant period herein are not too clear by reason of the relationship between Bruce, Inc., Bruce Construction Company, and Wallace T. Bruce, it does appear that, by credits and otherwise given to Wallace T. Bruce, by Bruce, Inc., the total amount due on the purchase contract was satisfied before the end of 1956. No formal declaration of dividends was declared by Bruce, Inc.

The fair market value of the land as of April 14, 1952, according to Wallace T. Bruce, was $198,000, although the cost or basis to him would appear to total some $6,578. It appears that the total cost to Bruce, Inc., in the development of the property was $14,811.16. In computing its profits on the sale of the lots, Bruce, Inc., took as its base cost the sum of $198,000 plus the cost of the improvements to the property. It deducted the so-called interest payments payable under its purchase agreement with Bruce in its tax return. On the other hand, Wallace T. Bruce in computing his joint income tax returns with his wife, listed the payments or credits made to him under the purchase agreement as gain from the sale of a capital asset. The Commissioner of Internal Revenue, however, determined that Bruce, Inc., was not entitled to interest deductions payable under the purchase agreement. He contended that such payments to Bruce were dividends on a contribution to capital. In arriving at the profit on the sale of lots, the cost or basis of the Cedar Lake tract was, according to the Commissioner, the cost or basis in the hands of Wallace T. Bruce, plus the amount which Bruce, Inc., had spent for capital improvements. The Commissioner also held that the payments of principal and interest under the purchase agreement constituted taxable dividends to Bruce.

■ Plaintiffs complied with the rulings of the Commissioner, but filed timely claims for refund and commenced these suits. Bruce and his wife seek a refund of $10,581.14 in income taxes paid for the calendar year 1955. The basis of their claim is that the transfer of the Cedar Lake land to Bruce, Inc., was pursuant to a bona fide agreement to purchase and sell, and that they are entitled to a long-term capital gain treat-

ment of the proceeds received. They contend that the payments received were taxed erroneously as income by way of dividends. Bruce, Inc., brings its action to recover $908.32, the tax it was required to pay for the tax year ending June 30, 1956. Its position is that the amounts paid as interest on the purchase agreement with Wallace T. Bruce are deductible as ordinary business expense. Stating it another way, the Government contends that the purported purchase and sale of land was merely an arrangement whereby Bruce contracted for the capital or equity interest in Bruce, Inc., and that the so-called principal and interest payments were dividends on capital and hence should be considered for income tax purposes as ordinary income to him. It is, of course, well recognized that a distribution of money or other property to its shareholders by a corporation with respect to its stock constitutes dividends to the shareholders. The crucial question presented which determines the issues in each case may be thus stated: Did Wallace T. Bruce contribute to the capital or equity in Bruce, Inc., or was the transaction a bona fide purchase and sale of the Cedar Lake land?

 The relevant statutes are Sections 112(b) (5) and 113(a) (8), 26 United States Code (1952 Ed.).[1] Plaintiffs strongly urge that neither the Commissioner nor the Court may arbitrarily determine that an investment in a com-

pany is a mere contribution to capital when the parties intend the transaction to constitute an indebtedness, citing Wilshire & Western Sandwiches, Inc. v. Commissioner, 9 Cir., 1949, 175 F.2d 718; Maloney v. Spencer, 9 Cir., 1949, 172 F.2d 638; Earle v. W. J. Jones & Son, Inc., 9 Cir., 1952, 200 F.2d 846. Concededly, plaintiffs are sound in this contention if the facts sustain the claimed intention. Further, plaintiffs point out that here, with a fixed maturity date, there was an unqualified obligation on the part of Bruce, Inc., to pay the principal of the purchase agreement together with interest within the reasonable future, that the purchase agreement made no provision for the scheduled payment of interest thereon to be made only out of earnings, that no voting rights were given to Bruce in the purchase agreement, and finally, that by credits and otherwise the entire purchase price was paid prior to the due date in the contract. In other words, according to the plaintiffs, the purchase agreement proclaims an apparent intention on the part of the parties to create a bona fide indebtedness between the corporation and its sole stockholder. But the intention of the parties is not to be ascertained from the mere form which may have been utilized in an arrangement between a sole stockholder and the corporation. Other factors may indicate that the substance of the arrangement should not be subordi-

---

1. "§ 112. Recognition of gain or loss.
\* \* \* \* \*
"(b) Exchanges solely in kind—
\* \* \* \* \*
"(5) Transfer to corporation controlled by transferor. No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation \* \* \*."
"§ 113. Adjusted basis for determining gain or loss.
"(a) Basis (unadjusted) of property. The basis of property shall be the cost of such property; except that—
\* \* \* \* \*
"(8) Property acquired by issuance of stock or as paid-in surplus. If the prop-

erty was acquired after December 31, 1920, by a corporation—
"(A) by the issuance of its stock or securities in connection with a transaction described in section 112(b) (5) (including, also, cases where part of the consideration for the transfer of such property to the corporation was property or money, in addition to such stock or securities), or
"(B) as paid-in surplus or as a contribution to capital,
then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made."

nated to its form. Wallace T. Bruce was in complete control of the corporate affairs of Bruce, Inc. He launched the corporation with a capital of $11,000. The formation of the corporation and the transfer of the land were mutually dependent steps comprising a single composite transaction. Obviously, the only hope he had of obtaining any return on the so-called purchase agreement was the success of the development and sale of the lots subdivided in the tract in question. The transfer of the property to Bruce, Inc., was an integral part of a plan and scheme on the part of Wallace T. Bruce to obtain thereby an assured participation in the fruits of the development and sale of the lots. In fact, it is conceded that the corporation was formed for that express purpose. Unless the proposed venture was a success, there was not the remotest possibility of the sole stockholder's receiving the payments scheduled in the purchase contract. It is generally recognized that one of the controlling factors in determining whether the transfer of property to a so-called "thin corporation" under the circumstances herein constitutes a bona fide sale of the property or is a mere contribution to capital, is the anticipated source of the payments to the stockholder. Here, the payments to Bruce were scheduled to correspond with the anticipated payments from the development and sale of the lots in the tract. In reality, that which Bruce did was merely to transfer the tract from his direct to his indirect ownership in order to participate in the earnings of the real estate venture which he promoted. As an insight to the real nature of the transaction, it is significant to note that, although the parties in their purchase agreement recited with apparent solemnity that the seller should furnish an abstract of title and that the buyer should have thirty days after receipt thereof for examination of the title, and further that if the buyer should default in any of the agreements and continue in default for ten days, the seller might terminate the contract with the reservation of the right of specific performance, it appears, however, that on the same day, to wit, April 14, 1952, that the purchase agreement was entered into, a deed to Bruce, Inc., conveying the tract of land was executed by Bruce and that the deed to the entire tract was filed on April 17, 1952. The land was transferred to Bruce, Inc., without any title or interest reserved in the transferor. Moreover, no security was taken by the transferor. The rights of any judgment or lien creditors in the land would be superior to the claims of Bruce under his so-called purchase agreement.

Reference may be made to the ratio of the purported indebtedness of the corporation to its capital, which is 17.1 to 1. This, of course, is a marked imbalance. The amount of the obligation of Bruce, Inc., as compared to its assets is even more striking in that it owed $188,000 after issuing $10,000 of its stock to Bruce, and then returning the consideration of $10,000 to him as the initial payment on the contract of purchase. The ratio of indebtedness to assets, therefore, was 188 to 1. Such an imbalance indicates that the stockholder could not expect repayment out of the present assets of the corporation. The land itself was vacant. It produced no income. Consequently, it seems clear that if Bruce, Inc., was not successful in its real estate venture, there was no hope for Bruce's realizing anything on his contract of purchase without proceeding by way of judgment against the land, taking his chances with other general creditors and being subordinated to any judgment or lien creditors. With only $1,000 in assets, it cannot be seriously contended that the expense of platting, subdividing, grading streets and selling the lots could be carried on by Bruce, Inc. It would seem that the factual situation herein presents a striking example of the contribution of risk capital to the corporation.

The recent decision of Aqualane Shores, Inc. v. Commissioner, 5 Cir., 1959, 269 F.2d 116, is persuasive authority for the conclusions reached herein.

There, a corporation was organized for the purpose of developing a 175-acre mangrove swamp for housing purposes by three grading contractors, a father and his two sons, who theretofore had been operating their business as partners. The incorporators transferred $1,000, together with land allegedly worth $250,000, with a mortgage thereon of $49,000, to the corporation, and received among them capital stock with a par value of $9,600 and the corporation's promise to pay a total of $191,871.12 in five annual installments with interest. A nominal amount was paid on the first installment. However, none of the remaining installments were paid. One of the incorporators, the father, subsequently made two unsecured loans of $10,000 each to the corporation. At the commencement of its business, the corporation had as assets the land and $600, but it owed $241,000, which was about 96 per cent of the purchase price. The court held that the corporation obtained the same basis in the land for capital gain or loss purposes as it had had in the hands of its incorporators in that the purported note was determined to be a "security" within the meaning of the Internal Revenue Code of 1939, Section 112(b) (5). The payment of the corporate obligation was held to be dependent upon and at the risk of the success of the venture. "[T]he property was not income producing and required expenditure of development costs to make it subject to profitable sale. The contract obligations clearly represented risk capital." , Aqualane Shores, Inc. v. Commissioner, supra, 269 F.2d at page 120.

The case of Camp Wolters Enterprises, Inc. v. Commissioner, 5 Cir., 1956, 230 F.2d 555, certiorari denied 352 U.S. 826, 77 S.Ct. 39, 1 L.Ed.2d 49, relied upon in Aqualane Shores, Inc. v. Commissioner, supra, is also relevant. There, the taxpayer corporation issued on its organization promissory notes amounting to $411,080.20, payable in five to nine years in return for assignments from its 89 incorporators of claims against the United States for buildings standing on Camp Wolters. The court there held that the basis to the corporation of the Camp Wolters real estate included only the actual money expended, about $416,274, and could not include the amount of the notes due the incorporators in that the exchange was for "stock or securities" within the meaning of Section 112(b) (5) of the Internal Revenue Code of 1939. Although the time period of a note is a fact to be taken into consideration in determining whether it is a stock or security, Chief Judge Hutcheson pointed out that, notwithstanding the fact that the notes had all been redeemed within two years, they were not short-term loans nor were they for "current corporate needs" but were "participation." 230 F.2d at page 560.

Two other related cases arising out of a single factual situation are also pertinent. They are Perrault v. Commissioner, 10 Cir., 1957, 244 F.2d 408, affirming 1955, 25 T.C. 439, and Houck v. Hinds, 10 Cir., 1954, 215 F.2d 673. There, five partners in a paint manufacturing and distributing business organized a corporation to which business assets worth $582,773.54 were transferred and subscribed for $50,000 in capital stock, of which only $1,000 was then paid. Short-term notes amounting to $50,000 to become due within three months were issued to the incorporators. Ten-year interest bearing installment notes amounting to $532,773.54 were also issued for the balance due for the business assets which had been transferred. The courts there held that payments made on both the short and long term notes were dividend distributions for income tax purposes in that the transfer of the partnership assets was for a stock interest in the corporation. It is significant that some of the notes issued at the organization of the corporation and maturing within only three months were considered obligations to distribute dividends. It also may be observed that there is even more of an imbalance toward indebtedness as opposed to stated capital in the financial structure here than in the cited cases.

The principal cases which plaintiffs urge in support of their contention are Associated Investors, Inc. v. United States, D.Kan., 1956, Par. 9396, 57–1 U.S.T.C. 56,695; J. I. Morgan, Inc., 1958, 30 T.C. 881; Warren H. Brown, 1956, 27 T.C. 27; Sun Properties, Inc. v. United States, 5 Cir., 1955, 220 F.2d 171; Leonard J. Erickson, Par. 56,256 P–H Memo.T.C. (1956). In several important factors, the factual situations in the cases cited differ from the case at bar But so far as the conclusion reached may differ from the conclusion attained here, the Court is of the opinion that the teachings of Aqualane Shores, Inc. v. Commissioner and Camp Wolters Enterprises, Inc. v. Commissioner, supra, constitute the more persuasive authority in tax cases arising from the creation of a so-called "thin corporation."

The Government contends that either Bruce's right to payment from Bruce, Inc., was incident to his stock ownership or the obligation to pay the quarterly payments under the so-called purchase contract constituted a security within the meaning of Section 112(b) (5), 26 United States Code. In reality, Bruce received all of the stock of the corporation in consideration for a small amount of cash and the transfer of the entire tract of land to the capital of the corporation. It is not necessary to determine whether the corporate obligation to pay the quarterly payments constituted an issuance of securities by Bruce, Inc. It does seem clear that the transfer of the undeveloped land to the corporation was a contribution to its capital by Bruce, and that, in exchange therefor, he, as the lone stockholder, was to receive the anticipated profits and earnings of the company derived from the development and sale of the land. He received the profits and earnings of the corporation, and under the showing here, such return to him must be considered dividends within the purview of Sections 301(a) (c) (1) and 316(a), Internal Revenue Code of 1954.[2]

▇▇ It follows from the foregoing that the Commissioner correctly applied Sections 112(a) (5) and 113(a) (8), 26 Internal Revenue Code, when he held that the amount received by Bruce, Inc., from the sale of the lots during the fiscal year 1956 is taxable as a capital gain so far as it exceeds Bruce's cost or basis, plus the improvement costs. Moreover, the Commissioner was correct when he held that the payments received by Bruce under the so-called purchase agreement should be treated as dividends and that no interest on the payments is deductible for tax purposes by Bruce, Inc. Plaintiffs' motions for summary judgment, therefore, must be denied. It is so ordered.

In that the parties recognize that the only question presented under the pleadings and showing made herein is whether Wallace T. Bruce in making the transfer of the real estate in question entered into a bona fide purchase and sale of the land or made a contribution to the capital of Bruce, Inc., and in that the Court finds that Wallace T. Bruce merely made a contribution to capital, it follows that defendant's motion for summary judgment in its favor must be granted. It is so ordered. Exceptions are allowed.

2. "§ 301. Distributions of property
"(a) In general.—Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect of its stock shall be treated in the manner provided in subsection (c).
 * * * * *
"(c) Amount taxable.—In the case of a distribution to which subsection (a) applies—

"(1) Amount constituting dividend.— That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income."
"§ 316. Dividend defined.
"(a) General rule.—For purposes of this subtitle, the term 'dividend' means any distribution of property made by a corporation to its shareholders * * *." 26 U.S.C. §§ 301(a), (c) (1), 316(a).