LOTS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

C. B., JR., AND MARTHA JEAN CHRISTIE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3059–65, 3060–65. Filed February 28, 1968.

*Paul W. Eggers* and *Harold D. Rogers*, for the petitioners.
*Roy E. Graham*, for the respondent.

546

**OPINION**

The question in this issue is whether the funds advanced to Lots, Inc., by petitioner for development of the Colonial Park subdivision were in reality loans, as petitioner contends, so that the interest paid thereon is deductible by Lots, Inc., or whether, as respondent contends, they were capital contributions and the distributions to petitioner were in the nature of dividends.

Several principal tests have been laid down by the courts for determining this question. One of these is the true intention of the parties; that is, whether the advances to the corporation were intended to establish an actual debtor-creditor relationship or whether they were intended as capital contributions. In *Sam Schnitzer*, 13 T.C. 43, affirmed per curiam 183 F. 2d 70, certiorari denied 340 U.S. 911, the Court said:

This question is one of fact. *Cohen v. Commissioner, supra*. And in deciding whether or not a debtor-creditor relation resulted from advances, the parties' true intent is relevant, *Fairbanks, Morse & Co. v. Harrison* (N.D. Ill.), 63 Fed. Supp. 495; *Edward Katzinger Co., supra; Daniel Gimbel*, 36, B.T.A. 539. Bookkeeping, form, and the parties' expressions of intent or character, the expectation of repayment, the relation of advances to stockholdings, and the adequacy of the corporate capital previously invested are among circumstances properly to be considered, for the parties' formal designations of the advances are not conclusive, *United States v. South Georgia Ry. Co., supra,* * * *

In form and in the bookkeeping entries, petitioner's advances to Lots, Inc., were all treated as loans. Notes were given by Lots, Inc., which had definite due dates and bore interest at the usual interest rate. They were all paid. There was no discernible intention on the part of the parties to treat the advances other than as loans.

Respondent argues that this is an instance where substance should prevail over form. We recognize the generally accepted rule that as to tax consequences substance rather than form must prevail. See *Commissioner v. Court Holding Co.*, 324 U.S. 331; *Burr Oaks Corp.*, 43 T.C. 635, affd. 365 F. 2d 24, certiorari denied 385 U.S. 1007; *Emanuel N. (Manny) Kolkey*, 27 T.C. 37; and cases cited therein.

We do not think the substance-over-form rule is applicable to the facts here, however. We agree with respondent that the ultimate objectives of the parties—the substance—was for the petitioner to finance the development of the subdivision and for the other participants to do the actual work. However, it does not appear that it was intended for petitioner to finance the development with capital contributions rather than loans. Financing through loans, rather than additional capital contributions, without disturbing the capital interests of the stockholders was, it seems to us, the more practical procedure, and no less objective than capital contributions. That seems to have been the intention of the parties, at least after the incorporation.

Respondent argues that it is apparent from the preliminary agreement of August 14, 1959, that the advances were intended as "risk" capital. There is some indication that this may have been what the parties first had in mind but whatever may be said of this agreement, the evidence is that it was not followed but was considered abandoned after the parties organized Lots, Inc., to develop and operate the subdivision. The incorporation was not mentioned in the agreement.

It obviously was not contemplated in the original plan. Some of the procedures under corporate form were contrary to, or incompatible with, the conditions of the agreement.

Respondent also argues that the only source from which Lots, Inc., could repay petitioner's loans was from its earnings and profits and property inflated in value. This argument is not sound. The loans were made to finance either the purchase of land or the cost of developing the land, the recovery of which on the sale of the lots would not have increased Lots, Inc.'s earnings and profits but would have made available funds with which to repay the loans. There is evidence, too, that at the time of petitioner's loans, Lots, Inc., could have obtained the necessary funds from commercial banks on its own security. See *Aqualane Shores, Inc.*, 30 T.C. 519, affd. 269 F. 2d 116.

Respondent cites *Burr Oaks Corp.*, *supra*, as controlling here. The facts, we think, are distinguishable. There the land was purchased for subdivision by three individual speculators and transferred to the corporate developer at an inflated price of more than twice its market value and three times its cost. The stock of the corporation was issued to the wives and brothers of the owners who took no part in the development and the notes given, as claimed, in payment for the land were issued proportionately to the investors' stock-ownership (through their nominees) and remained substantially unpaid. Here the land was owned by a single individual who owned only 52 percent of the stock of the corporate developer and was paid for in cash. True the cash was borrowed on Lots, Inc.'s note which was endorsed by petitioner, but the note was fully paid and respondent has not determined that the land was a contribution to capital. The notes which the respondent here challenges were those given not for the land but for funds advanced for development expenses. They were not issued initially but after the sale, or contracts for the sale, of lots amounting to over $200,000. In holding the transfer of the land to the corporation was an equity contribution to capital we said in *Burr Oaks Corp.*, *supra* at 646:

As we view the creditable evidence presently before us, the transfer of the Burr Oaks property to petitioner is so lacking in the essential characteristics of a sale and is replete with so many of the elements normally found in an equity contribution (cf. *Emanuel N. (Manny) Kolkey*, 27 T.C. 37 (1956), affd. 254 F. 2d 51 (C.A. 7, 1958), and *Bruce* v. *Knox*, 180 F. Supp. 907 (D. Minn. 1960)) that it appears to us as nothing more than a shabby attempt to withdraw from petitioner, at capital gains rates, the developer's profit normally inherent in the subdivision and sale of raw acreage such as the Burr Oaks property.

What guided our ruling in the *Burr Oaks* case was not, alone, the thin capitalization but was the conglomerate "shabby" attempt to convert the ordinary income from the sale of the subdivision lots into

capital gains. Distinguishable on like facts is *Aqualane Shores, Inc.*, *supra*, also relied on by respondent.

The facts in the instant case are more like those in *Leach Corporation*, 30 T.C. 563, where we held that notwithstanding the high debt-to-equity ratio the corporation's bonded indebtedness for operating funds was a bona fide indebtedness on which the interest payments were deductible. See also *Charles E. Curry*, 43 T.C. 667.

Petitioner's transfers of the land to the Lots, Inc., were reported in his return as sales and were so treated by the Commissioner. No contention is made that the sales price did not reflect the actual value of the land. The notes held by the bank were all paid off with interest within the year of issuance.

Respondent takes the position in his argument here, for the first time, that the loans which Lots, Inc., obtained from the bank were in reality loans to petitioner, and thus capital contributions by petitioner. Respondent has made no such adjustments in his determination of Lots, Inc.'s tax liability.

Lots, Inc., was thinly capitalized, as respondent asserts, in that its paid-in capital of $10,000 was insufficient to finance the development and it was contemplated that the necessary operating funds would be provided by petitioner. However, it had assets equal to or in excess of its indebtedness to petitioner and had sales sufficient to insure its solvency and the payment of its notes. Its indebtedness to petitioner was never subordinated to the claims of general creditors. The evidence is, too, that at the time of petitioner's loans, Lots, Inc., could have obtained the funds from commercial banks on its own security. In these circumstances the thin capitalization did not give the notes the character of preferred shares or any other form of contributed capital, as in the *Burr Oaks* case. We conclude that the notes were in form and substance bona fide debts of Lots, Inc.

*Issue 2*

FINDINGS OF FACT

During the taxable year 1962, Lots, Inc., expended $13,054.98 in building a recreation shelter in Weeks Park, a municipal park owned and operated by the City of Wichita Falls. The shelter was located some 400 feet southeast and across a creek from the subdivision being developed by Lots, Inc. Upon its completion, the shelter became the property of the City of Wichita Falls. Lots, Inc., was required to build the shelter for the City in order to get the city's approval of the plat for its subdivision. At that time there was in effect a resolution of the City's board of aldermen requiring the setting aside of a portion of

each subdivision as a park area. In lieu of that requirement, Lots, Inc., agreed to construct the shelter on the park land already owned by the City, as was permissible under the resolution. The shelter added nothing to the value of Lots, Inc.'s property.

In its return for 1962, Lots, Inc., claimed the deduction of the cost of the shelter, $13,054.98, as a business expense. Respondent determined that it is not an allowable business expenses but must be capitalized as a part of the cost of developing the subdivision lots.

### OPINION

In this issue, Lots, Inc., argues that the cost of constructing the shelter was not a capital expenditure, since it did not result in the acquisition of a capital asset, but was an expenditure made to protect and promote its business and is therefore a deductible expense. It likens the payments to those allowed as expense deductions in *Edward J. Miller*, 37 B.T.A. 830, where an insurance agent paid the claims of customers who had been insured by the company then in receivership. The agent had made the payments to protect his established business. See also as to payments to protect or promote a going business, *First National Bank of Skowhegan*, 35 B.T.A. 876.

Here the expenditure was made in organizing and setting up a business, not in operating it. See *Dodd* v. *Commissioner*, 298 F. 2d 570, affirming a Memorandum Opinion of this Court.

*Jordon Perlmutter*, 45 T.C. 311, involved facts almost identical with those here, except that in the compliance with the zoning regulations the taxpayer set aside certain sections of its own land for public use. The taxpayer claimed the deduction of the value of the land not as business expenses but as charitable gifts. We denied the deduction on the grounds that the transferor had no donative intent and, further, that the expenditure was of direct benefit to the transferor. We said in our opinion:

We think that, whether the transfers were voluntarily or involuntarily made and irrespective of the underlying motivations, they represented a business expenditure of a capital nature and that petitioners have already received the maximum benefit through being allowed to add the cost basis of the transferred lands to the cost basis of the remaining property. *Sevier Terrace Realty Co.*, T.C.Memo. 1962–242, affirmed per curiam 327 F. 2d 999 (C.A. 6, 1964); *Woodside Mills* v. *United States*, 260 F. 2d 935 (C.A. 4, 1958), approving Rev. Rul. 57–488, *supra*; *Country Club Estates, Inc.*, 22 T.C. 1283 (1954).

Another case with closely related facts, which seems at first blush to support the petitioner here is *Sand Springs Railway Co.*, 21 B.T.A. 1291, where the taxpayer, the operator of a city railway, in order to obtain a franchise was required by city ordinance to furnish the city electric current for lights at stated rates and to pay the receipts from the sale of the current over to a local charitable institution. We held

that the continuing payments of the profits from the sale of current were deductible as business expenses because they were essential to a continuation of the taxpayer's railway business. The sale of electric current was not in itself an income-producing business, separate from the railway. The case is significant here chiefly for the purpose of comparison.

The cost of acquiring the city's approval of the subdivision plat here was like the cost of obtaining a liquor license from the City of Jersey City, N.J., *Tube Bar, Inc.*, 15 T.C. 922; the cost of acquiring the franchise for a motorcoach system in the city of Pasadena, Calif., *Pasadena City Lines, Inc.*, 23 T.C. 34; and the cost of obtaining the privilege to practice osteopathy as a staff member of the hospital staff of Albuquerque, N. Mex., *S. M. Howard*, 39 T.C. 833, all of which were held to be capital expenditures. We think it is clear that had Lots, Inc., donated a part of its land for park purposes the value of the land donated would be a part of the capital investment in the entire subdivision and would not have been deductible as a business expense. We do not believe that the fact that Lots, Inc., constructed a shelter on city-owned land in lieu of donating its own land would change the nature of the cost to Lots, Inc.

In *S. M. Howard, supra* at 838–839, the following was quoted from *United States* v. *Akin*, 248 F. 2d 742, 744, certiorari denied 355 U.S. 956:

It is not always easy to find a verbal formula which readily supplies an unerring guide in drawing the boundary line between current expenses and capital outlays. But it may be said in general terms that an expenditure should be treated as one in the nature of a capital outlay if it brings about the acquisition of an asset having a period of useful life in excess of one year or if it secures a like advantage to the taxpayer which has a life of more than one year. * * *

The obvious and, we think, the correct answer to the question here is that the payment which Lots, Inc., was required to make to the city by constructing the park shelter was capital outlay to be identified with the other costs of the subdivision project; it secured a "like advantage" to petitioner which had a life of more than 1 year. At any rate the evidence fails to show that respondent has erred in so determining.

## Issue 3

### FINDINGS OF FACT

By written agreement described as "Assignment of Oil and Gas Leases With Reservations," dated July 10, 1962, Felix G. Payne, Jr. (hereinafter referred to as Payne), sold and assigned to petitioner subject to the reservations and conditions therein set forth, all of his interest in the Trindle leasehold (located in Colorado) and the per-

sonal property used upon or obtained in connection therewith, effective July 1, 1962. This was a 45-percent interest in the leasehold, which Payne had acquired from Lakota Petroleum Corp. for $50,000 by assignment dated June 30, 1962, effective June 1, 1962. In connection with this assignment petitioner paid Payne $20,000 on July 10, 1962; and in the agreement Payne reserved 17 percent of the oil produced and sold from the lease until the market value of that oil aggregated $30,600, plus interest at 5½ percent on the unrecovered balance of the principal amount. A condition of the assignment was stated as follows:

Assignee or his heirs, successors or assigns, shall promptly pay to Assignor, his heirs, successors or assigns, the then fair market value of all equipment removed from the leases and such amount shall be credited first to the interest accrued on the said Production Payment reserved herein and, secondly, to the unrecovered balance of the said principal amount.

By written agreement designated "Assignment of Production Reservation," dated August 2, 1962, but effective August 1, 1962, Payne sold and assigned the aforesaid "production reservation" to petitioner, for which petitioner paid Payne $30,600 by check dated August 1, 1962.

At the time Payne sold his interest in the Trindle lease to petitioner there was only one oil well on the property, known as Trindle No. 1, and the following is a statement of the gross barrels of oil production from the well for the months stated:

| Date | Barrels |
|---|---|
| June 1962 | 285. 72 |
| July 1962 | 141. 45 |

Two additional wells were later drilled on the Trindle lease.

For the month of June 1962, Trindle lease oil sales attributable to the entire working interest amounted to $614.96, of which Payne's share was 45 percent. During the months of August through December of 1962 petitioner received oil payments of $1,123, of which petitioner allocated $722.11 to interest and $400.89 to principal.[3]

Upon assignment of the $30,600 production payment from Payne to petitioner, petitioner set up a production payment cost of $30,600 on his books and records. As petitioner received the proceeds of oil applicable to the production payment he credited such amounts first to interest and then to the principal amount of the production payment. The principal amount of the production payment paid out in February of 1964, resulting in a profit to petitioner, or an excess of payments received over the principal amount of the production payment, of $2,239.32. Petitioner reported the excess or profit as

---

[3] There is no evidence of the value of the oil payments produced in July 1962 attributable to the 45-percent working interest or to whom any payments therefor were made.

interest on his income tax returns but he did not report any part of the $30,600 principal amount received on the theory that it represented a return of his investment in the production payment, or was offset by cost depletion. For the year 1962, which is here involved, respondent has added the $400.89, which petitioner received and allocated to principal as noted above, to petitioner's income from the 45-percent working interest.

Payne was a former employee of petitioner's and at the time of his purchase of the working interest in the Trindle lease he occupied office space in petitioner's offices. He and petitioner had no business association at this time. Payne had been engaged in the oil business for a number of years, as had petitioner. He and petitioner discussed the purchase of the interest in the Trindle lease and consulted with petitioner's tax attorney about it. Petitioner advised Payne to make the purchase, with the understanding that he (petitioner) would purchase the 45-percent working interest from Payne for $20,000, with Payne reserving an oil payment of $30,600.

OPINION

Petitioner contends that he is entitled to recover his $30,600 cost of the oil payments before reporting any income therefrom. Respondent's position is stated in his brief as follows:

It is respondent's position on this issue that petitioners acquired an undivided 45 percent working interest in the Trindle lease for $50,600 in a two-step transaction. Respondent's first position is that the purported $30,600 production payment purportedly reserved by Payne and then sold to Mr. Christie was guaranteed by Christie's interest in the equipment on the lease and, therefore, does not represent a bona fide oil payment subject to depletion. [This contention is based on *Anderson* v. *Helvering*, 310 U.S. 404.]

The second position of the respondent, in the alternative, is that substance v. form governs in this case and Mr. Christie did not pay $20,000 for a 45 percent working interest in the Trindle lease subject to a reserve oil payment of $30,600, but in reality paid $50,600 for a 45 percent interest in the Trindle lease.

The parties have stipulated that, for depletion purposes, if this Court determines that petitioner's cost for his interest in the lease was $50,600, then $28,800.63 should be allocated to the leasehold, $17,257.92 to the equipment, and $4,758.45 to other acreage and that if a cost of $20,000 is determined, $11,297.88 is applicable to the leasehold, $6,821.31 to the equipment, and $1,880.81 to other acreage. They are in dispute however as to the actual value of petitioner's 45-percent interest in the equipment. According to the opinion of respondent's expert witness it had a 1962 value, after the addition of wells No. 2 and 3, of over $28,000, while petitioner's witness valued it at $8,369.

The Supreme Court held in *Thomas* v. *Perkins*, 301 U.S. 655, that upon the assignment of an interest in an oil lease the reservation of an

oil production payment by the assignor, payable solely out of the oil produced, reserved to the assignor a depletable economic interest in a sufficient amount of the oil produced to make the payment, and hence the proceeds of the oil received by the assignor attributable to the production payment was not includable in the income of the assignee. However, in *Anderson* v. *Helvering*, 310 U.S. 404, the Court held that where the assignor reserved to himself, in addition to an oil production payment, an interest in the proceeds from the sale of the fee title to the land from which the oil was to be produced as additional security, the assignor did not reserve an economic interest in the oil from which the payment was to be made, and that the income from the sale of that oil was includable in the income of the assignee. The Court likened the reservation of an interest in the fee to a personal guarantee by the assignee that the oil payment would be paid in any event, so the deferred payments received by the assignor must be treated as payments received upon a sale to the assignee, not as income derived from the consumption of its capital investment in the reserves through severance of oil and gas. The Court also said:

In the interests of a workable rule, *Thomas* v. *Perkins* must not be extended beyond the situation in which, as a matter of substance * * * the reserved payments are to be derived solely from the production of oil and gas. * * *

The main thrust of the argument of both parties here is directed to the question of whether the reservation to Payne, in the assignment of July 10, 1962, of the right to have applied to the production payment the fair market value of all equipment removed from the leases, gave Payne such additional security for payment of the $30,600 production payment as to make the payments received part of the sales price of the 45-percent working interest sold to petitioner under the rationale of the *Anderson* case, or whether such right was merely incidental to the production payment so that Payne reserved a separable interest in the production payment which petitioner acquired in a separate transaction for $30,600, which would be his basis for cost depletion. However, we decide this issue on other grounds and, for reasons stated in the footnote below,[4] choose not to decide the question posed above.

---

[4] Petitioner argues that the quoted condition in the agreement gave Payne the right to only 17 percent of the value of any equipment removed from the lease, that the salvage value of such equipment was negligible, and that the equipment necessary to remove the oil was an integral part of the production payment and did not constitute additional security for payment of the purchase price or production payment. Respondent argues that the quoted condition gave Payne the right to have the entire 45 percent of the value of any equipment removed from the lease applied to the production payment, that the value of such equipment was considerable, and that it was security for payment of the deferred purchase price for the 45-percent working interest within the rationale of *Anderson* v. *Helvering*, 310 U.S. 404.

It would appear from the language used by the Supreme Court in the *Anderson* case, limiting the rule of *Thomas* v. *Perkins*, 301 U.S. 655, to situations where the reserved payments are to be derived *solely* from the production of oil and gas, that any type of

In both *Thomas* v. *Perkins, supra,* and *Anderson* v. *Helvering, supra,* the question was to whom the income attributable to the production payment was taxable. Here, we are concerned only with the income attributable to the production payment after it was assigned to petitioner, and there can be no question that it is includable in petitioner's income because he received it and at that time no one else had any claim to it. The question here is whether petitioner can divide his total investment in his interest in the lease, $50,600, between the 45-percent working interest ($20,000) and the production payment ($30,-600). We conclude that petitioner is not entitled to do so, but that petitioner must treat the entire $50,600 he paid Payne in 1962 as his capital investment in the 45-percent working interest in the Trindle lease, which is recoverable through depletion and depreciation deductions in accordance with the allocation of the total purchase price among the various assets acquired as stipulated by the parties.

When petitioner took an assignment of the production payment from Payne he then was the sole owner of the 45-percent working interest in the lease with all the rights and privileges pertaining thereto and was entitled to all the income allocable thereto. He was the sole owner of a depletable interest in all the oil in place and a depreciable interest in all the equipment, attributable to the 45-percent working interest, for which he had paid $50,600. We need not determine whether there was a merger of the working interest and the production payment (see *Herndon Drilling Co.,* 6 T.C. 628),[5] because we think it is clear from the circumstances involved in the transactions between petitioner and Payne that when petitioner agreed to buy the working interest from Payne it was intended that petitioner acquire the entire 45-percent working interest with no reservations, and that the two separate transactions were designed only to permit Payne to realize a small profit on

additional security having any substantial value would make the rule of the *Anderson* case applicable, and that the equipment here involved would fall into that category unless an allocable interest in the equipment is considered by law, custom, or agreement to belong to the owner of the economic interest in the oil. It also appears from the language used in the quoted condition that the value of 45 percent of any equipment removed, instead of just 17 percent, would be allocable to the production payment, and that that value was more than negligible. It is our understanding that this equipment would not normally be removed until the well ceased production so it is difficult to understand why the equipment would be considered an integral part of a nonguaranteed production payment if the payment is limited solely to the proceeds of oil produced; and our dilemma in this respect is buttressed by the fact that the parties found it necessary in this agreement to include a specific provision making the value of any equipment removed payable on the production payment.

Thus, while we lean toward respondent's theory on this question, we find it unnecessary and we choose not to decide the issue on that ground, because we cannot determine with any certainty from the evidence and the briefs just what the legal and/or customary rights of a holder of a production payment are in the equipment used to produce the oil to make the payment.

[5] In this case, however, the question was whether taxpayer's fee interest in an undivided one-half interest in a lease merged with taxpayer's oil production payment reserved out of the other undivided one-half interest in the lease, which was owned by someone else. Here, at the critical time, petitioner owned both the production payment and the working interest out of which the production payment was reserved.

the transaction and to permit petitioner to derive a tax benefit by attempting to fracture the interest into two component parts.[6] We do not believe the short period of time during which Payne ostensibly held the production payment can serve to divide petitioner's interest in the whole for purposes of segregating petitioner's income here involved. *Estate of H. W. Donnell*, 48 T.C. 552, 568, on appeal (C.A. 5).

We find no sound reason from the evidence why Payne would have been willing to sell his 45-percent working interest in the lease for $20,000 cash and a nonguaranteed $30,600 production payment from only 17 percent of the oil produced. He had paid $50,000 for the entire 45-percent working interest only 10 days before. Arrangements had been made for him to purchase the working interest after he and petitioner had talked to petitioner's tax counsel. If Payne was interested in making a quick profit of $600 we cannot help but believe that this was discussed at that time. On the other hand if Payne was primarily interested in the 5½-percent interest payable on the unrecovered balance of the production payment, he would have held it longer.

Nor can we find from the evidence any but tax-benefit reasons why petitioner would buy the entire 45-percent working interest in two transactions just 30 days apart rather than in one transaction. Petitioner testified that he had not agreed to buy the production payment from Payne in advance but gave as his reason for buying it 20 days later, when Payne offered to sell it to him for $30,600, that he had some spare cash that was invested at 4 percent and he wanted to make or save the additional 1½-percent interest payable on the production payment. However, the evidence is pretty clear, and we have taken it into consideration in deciding the first issue herein, that petitioner had ample liquid assets to pay for the entire 45-percent working interest both at the time Payne bought it and when he bought the working interest from Payne, ostensibly for $20,000. Payne was not called as a witness to give his explanation of why the transactions took this form.

We conclude that the substance of the transactions between petitioner and Payne was that Payne assigned a 45-percent working interest in the Trindle lease to petitioner for $50,600 and that the income received by petitioner from the lease must be treated for tax purposes as hereinabove indicated.

*Decisions will be entered under Rule 50.*

---

[6] In a letter dated July 6, 1962, from E. M. Schlaikjer, president of Lakota Petroleum Corp., to petitioner, which made reference to an operating agreement dated June 30, 1962, Lakota gave *petitioner* the right to take over operation of the property should Schlaikjer die before Christie. This letter predated petitioner's original transaction with Payne dated July 10, 1962.